Powell *v.* Risser, Appellant.

Argued April 15, 1953. Before STERN, C. J., STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Harold A. Butz,* with him *Kenneth H. Koch, Philip H. Strubing, Butz, Steckel, Hudders & Rupp,* and *Evans, Bayard & Frick,* for appellants.

*Samuel D. Frederick,* with him *Milton J. Goodman, Henry L. Snyder* and *Snyder, Wert & Wilcox,* for appellee.

*O. Jacob Tallman,* with him *H. J. Woodward,* Deputy Attorney General, and *Robert E. Woodside,* Attorney General, for Commonwealth of Pennsylvania, under Rule 46.

OPINION BY MR. JUSTICE ARNOLD, October 5, 1953:

The plaintiff, Powell, brought this action of trespass to recover damages for personal injuries to his hands, alleged to have been sustained by reason of the

improper conduct of Dr. Mark Risser, Dr. Norman Daley and Dr. Harry F. Hoffman. The court below entered a nonsuit as to Dr. Hoffman, who was superintendent of the Allentown State Hospital. The plaintiff did not appeal from the refusal to take off the nonsuit. A verdict was returned against Dr. Risser and Dr. Daley, on which judgment was entered, and the defendants appealed from the refusal of their motion for judgment n.o.v.

The plaintiff was admitted as a patient to the Allentown State Hospital (for the insane) in September, 1943, suffering from a mental illness, to wit manic depressive psychosis. He was about 19 years of age and physically sound. About May 1, 1946, the plaintiff escaped from the hospital and was returned by the police on the following day. He was brought to the hospital in a manic state, violent, threatening to run away and liable to injure himself and others. His physical condition was good.

The illness from which plaintiff was suffering is characterized by fluctuations from periods of depression, worry, loss of weight, to periods of over-activity, lack of restraint and excitability. Part of the time the patient may seem entirely normal. His emergence from one mood to another may occur suddenly. During the over-active period the patient, in common language, is a raving maniac. Plaintiff's record at the hospital was one of furloughs in the charge of his family, stealing and wrecking of automobiles, and return from such escapades to the hospital by the police. On May 2, 1946, when the plaintiff was brought back to the hospital by the police, Dr. Risser directed the supervisor of nurses, Buck, to administer a wet pack. Having done so, the supervisor of nurses reported to Dr. Risser that the plaintiff's physical condition was all right, but that he was violent and threatening, and

that there was no way of keeping him except in the pack. Thereupon Dr. Risser ordered a second wet pack. Later the supervising nurse reported to Dr. Risser that the plaintiff was still violent and threatening, but that his physical condition was good. Dr. Risser ordered the wet pack treatment continued so long as the patient was violent and maniacal, providing his physical condition remained good. All told three wet packs were administered by the nursing personnel and the attendant, the last pack being administered on May 3. These wet pack treatments differed in no way from the accepted and standard practice, not only in the Allentown State Hospital but in all other mental institutions operated and maintained by the Commonwealth. Such treatments are the most modern and humane method yet devised for the restraint of violent, raving and desperate patients.

Following the administration of the wet pack treatments the plaintiff's hands were considerably affected, so that he now has a 60% impairment of their use.

The wet pack treatment is administered to patients whose mental condition renders them violent, and is both a means of calming them emotionally through the therapeutic effects of warm water and of restraining them from violence. Such treatment is administered in the following manner: Sheets numbering usually six are immersed in water. They are then wrung dry, the arms are separately wrapped, and the sheets then wrapped around the body and the arms and legs, so that the patient is completely swathed in sheets from his head to the tips of his toes. Two sheets are used as ties, one placed about the body and arms in the region of the elbows and tied, and the other is tied above and below the knees. The patient is able to move his limbs but he cannot free himself. He is then immersed in a tub of water, the temperature of which

is controlled by a thermostat at about 94 to 96 degrees. He is kept in the water for a period of approximately six hours. He is then taken out, the sheets are removed, and he is bathed and the body rubbed with oil or grease. Fresh sheets are then applied and he is again immersed in the water. Generally the patient receives a series of these treatments, the number and duration of which depend upon his mental and physical condition.

During the time of the wet pack treatment proper practice requires the *nursing personnel* to note the temperature of the patient, the pulse rate and respiration, and make report to the physician of the patient's condition if anything unusual occurs. While the treatments are given only on order of the physician, their administration,—that is, wrapping of the patient in sheets, the immersion in water, check of water temperature, pulse, respiration, and observation of the patient and reporting thereon to the physician,—is strictly a nursing procedure, and is performed only by the nurses and attendants. At no time are physicians present or required to be present unless the reports from the nurses and attendants indicate a necessity therefor.

About 24,000 of the wet pack treatments are administered in the Allentown State Hospital every year without any injurious effect.

Dr. Goshorn was plaintiff's expert on the subject of the method of administering wet packs. Both on direct and cross-examination he reiterated that it is entirely a nursing procedure, and that the physician is never present or required to be, does not observe the patient, but relies on reports from the nurses. He testified that the mental condition of the plaintiff might require continuing the treatment without regard to the physical condition. His opinions were based on

23 years of experience. Not a single person, physician or layman, appeared to contradict the evidence, or to deny that it was the standard practice, or to state that it was improper and not in accordance with the best practices of the profession.

The duties imposed by law on the defendant physicians are to employ such reasonable skill and diligence as is ordinarily exercised in their profession, giving due regard to the advanced state of the profession at the time of treatment: *Wohlert v. Seibert,* 23 Pa. Superior Ct. 213, 218; *English v. Free,* 205 Pa. 624, 625, 55 A. 777; *Stemons v. Turner,* 274 Pa. 228, 231, 117 A. 922; *Duckworth v. Bennett,* 320 Pa. 47, 51, 181 A. 558.

It has been uniformly held that expert testimony is necessary to establish negligent practice in any profession: *Wohlert v. Seibert,* 23 Pa. Superior Ct. 213, 216; *Bierstein v. Whitman,* 360 Pa. 537, 541, 62 A. 2d 843. What the lower court decided and what was determined by the jury was not whether the defendants had been guilty of negligence in following the well-recognized and established mode of treatment, but rather whether the mode of treatment was proper. This, in the face of testimony produced by the plaintiff's own experts showing that the treatment and methods employed were of long standing both in the Allentown State Hospital and elsewhere. Thus, the court permitted the jury of laymen, without knowledge of these practices, to say that a treatment was improper which expert witnesses said was in accordance with the accepted practice.

In *Bierstein v. Whitman,* 360 Pa. 537, 541, 542, 62 A. 2d 843, the action was for malpractice of a dentist in fracturing the jaw of a patient during the extraction of a tooth. This Court said: " 'All that is shown is that the defendant did certain things and

failed to do other things. But whether a careful, skilful, and diligent practitioner would have done otherwise, we do not know'. The plaintiff concedes the accuracy of the principle of law thus applied. It is argued, however, that a jury of laymen under the present facts could find negligence in the same manner as in any other tort action. It is urged that a lay jury might find that plaintiff's jaw was found to have been broken, and from this fact might conclude that defendant had used unwarranted force and was therefore negligent. We disagree with such doctrine . . . Negligence may not be *inferred* by *laymen* merely because the jaw was found to have been broken. A jaw could be broken even though there was no lack of care or skill by the dentist. *Expert* testimony is necessary to establish negligent practice in any profession: . . . Wigmore on Evidence, Third Edition, Vol. VII, Sec. 2090, p. 453. As plaintiff failed to offer any *expert* witness to establish the measure of professional skill required of a dentist in extracting a tooth, she did not meet the burden of establishing, by the weight of the evidence, that defendant failed to treat her with reasonable and ordinary professional skill: [citing cases] . . . The record discloses no testimony as to the standard of care required under the circumstances and such burden was therefore not met by plaintiff."

In the instant case the plaintiff failed to show by any expert testimony just what Dr. Risser should have done or refrained from doing. From the circumstances that a verdict was recovered the inference is that Dr. Risser should have been present, that he should have examined the plaintiff between each pack and during the course of them. The testimony of all the experts called on either side of the case was that this requirement was not a part of the standard and accepted practice.

It is also the general rule that a physician is not liable for injury to a patient where such occurs as a result of nursing procedures: *Shull v. Schwartz,* 364 Pa. 554, 556, 73 A. 2d 402, in which case the defendant surgeon performed an operation on the wife-plaintiff. Later a hospital intern was directed by the surgeon to remove the stitches and in doing so failed to remove two of them. This Court on appeal affirmed the principle that the liability of the defendant does not apply to treatment administered by floor nurses and interns in the regular course of service furnished by a hospital, and that as to all such care and attention the nurses and interns would clearly be acting exclusively on behalf of the hospital and not as assistants to the surgeon.

In *Stewart v. Manasses,* 244 Pa. 221, 90 A. 574, the defendant was a family physician and procured the admission of the plaintiff to a hospital and assisted the chief surgeon in the operation. After the operation plaintiff was removed from the operating room to the recovery room where nurses had prepared a bed and negligently left in it a hot water bottle. When the plaintiff was placed in the bed she was burned or scalded. This Court held that the plaintiff's case was without any support, and that the injury was caused by the negligence of the hospital nurses whose work the defendant was under no duty to supervise, and for whose negligence he was not responsible. See also *Hohenthal v. Smith,* 114 F. 2d 494.

Since, to make out a case, the plaintiff must show by expert testimony that there was a deviation from proper practices in the administration of the wet packs, and since he failed to do so, the doctrine of exclusive control is not in this case. Cf. *Kelly v. Yount,* 135 Pa. Superior Ct. 528, 531, 7 A. 2d 582; *Bierstein v. Whitman,* 360 Pa. 537, 62 A. 2d 843.

The lower court therefore erred in imposing such a duty upon him in the face of the evidence in the case. There was also a wide variation in the opinions of plaintiff's experts as to what caused the plaintiff's injuries. Cf. *Mudano v. Phila. Rapid Transit Co.*, 289 Pa. 51, 137 A. 104.

As to the defendant, Dr. Norman Daley, the allegation was made that after the plaintiff had undergone the wet pack treatments his hands were in bad shape from blisters, some of which had opened and some of which had to be opened. Dr. Daley first saw the plaintiff at least four days[1] after the last wet pack was administered. Dr. Daley is alleged by the plaintiff to have opened several blisters with a pocket knife taken from his pocket. Assuming this to be true, there is no evidence that the use of the non-sterile knife could have produced the injuries to the plaintiff, or indeed contributed to them. The plaintiff's only expert on this phase of the case, Dr. Marcks, stated that he did not "believe that infection had a thing to do to contribute to the development of the deformity [of the plaintiff's hands]"; and testified that "the use of unsterile instrument . . . to open blisters as mentioned, *might* contribute or be a contributing cause to infection, but not a contributing cause to the deformity this man has." (Italics supplied). The testimony of Dr. Marcks was plainly insufficient to charge Dr. Daley with negligence in that it failed to show the connection between the injury resulting from the negligent act and a later condition. In *Monahan v. Seeds & Durham*, 336 Pa. 67, 71, 6 A. 2d 889, this Court said: "When, in cases of this class, expert testimony is relied on to show the connection between an alleged cause and a certain result, it is not enough for the doctors to say simply that

---

[1] Under the evidence it is difficult to tell what length of time intervened between the last wet pack and the visit to Dr. Daley.

the ailment in question might have resulted or 'most probably' came from the assigned cause, or that the one could have brought about the other; they must go further and testify at least that, taking into consideration all the attending data, it is their professional opinion the result in question *came* from the cause alleged: Vorbnoff v. Mesta Machine Co., 286 Pa. 199; Elonis v. Lytle Coal Co., 134 Pa. Superior Ct. 264." It therefore follows that a verdict cannot be sustained against Dr. Daley.[2]

The judgment is reversed and judgment is hereby entered for Dr. Mark Risser and Dr. Norman Daley notwithstanding the verdict.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The assumed therapeutics administered to the plaintiff in this case read like the chronicle of a medieval torture. This does not say that the plaintiff's condition might not have warranted such treatment. The

---

[2] Incidentally, no joint verdict could have been had against Dr. Risser and Dr. Daley. Dr. Daley's alleged negligence was not concurrent with the alleged negligence of Dr. Risser. Dr. Daley, therefore, could not be held for any of the acts of Dr. Risser. See *Howard v. Union Traction Company*, 195 Pa. 391, 45 A. 1076, and *Wiest v. Electric Traction Company*, 200 Pa. 148, 49 A. 891, where this Court said, at page 152: "A joint verdict may . . . be rendered against such of the defendants as are jointly liable. But, if no concert of action is shown, and, therefore, no joint tort, and the case is one of separate tort or torts, upon the part of one or of several defendants, the action is not sustained, and there should be no verdict against any one. In a suit for a joint tort there should be no recovery upon proof of one or more separate torts. When a joint tort is charged, a joint tort must be proved, in order to sustain the action. The allegation and the proof must agree in cases of tort, as in other cases." See also Shearman & Redfield on Negligence, revised edition, Vol. 1, §148.

care of mental patients sometimes requires the application of physical restraint which must seem cruel and brutal to those unfamiliar with the routine of mental institutions. However, the unnecessary or reckless use of violent measures which steal away physical assets from one already robbed of the treasures of a sound mind constitutes a misdeed which humanity abhors, justice condemns and the law should correct.

Reynold F. Powell, now 29 years of age, apparently enjoyed good health—physical and mental—until he enlisted in the United States Army at the age of 18. After being honorably discharged from the military service for medical reasons, he returned home and obtained employment at the Bethlehem Steel Company as a chemical analyst in the testing of metal. As an infant, Powell showed aptitude in music, and in youth and young manhood learned to play, repair and tune pianos and play the trumpet. Prior to entering the Allentown State Hospital his hands were without defect or blemish and responded faithfully to the demands of his vocation and avocations of chemical analyst, musician, piano tuner, typist and carpenter. Today those hands are in ruins. Scarred, gnarled, crippled and deformed, they have lost 60% of their normal functions. The inevitable tools he needed in earning his livelihood have been practically destroyed.

This catastrophic loss was caused by the event which is the subject of the lawsuit appealed to us for final judgment.

Reading the court record in the light most favorable to the plaintiff, as we are required to do in considering an appeal for judgment non obstante veredicto,* the following narrative of events is indicated. In the early part of May, 1946, Reynold Powell was

---

* *Lasater v. Conestoga Traction Co.*, 306 Pa. 500, 503.

returned to the Allentown State Hospital from which he had escaped after having reportedly been beaten by an attendant. On the evening of his readmittance to the hospital Dr. Mark Risser, without examining him, ordered him to be prepared for wet packs. Powell was undressed and placed on a table. A wet sheet went tightly around each arm. Both arms were pinned to his sides, and four other enveloping sheets encased his body from chin to toe. Two more wet sheets, folded into ropes, were thrown about his waist and legs and knotted tightly, maximum tautness being achieved by one of the attendants placing a foot against his body and pulling against the middle. In this mummified form Powell was now tied to his bed and complete immobilization was secure.

As the sheets began to dry, constriction set in, which impinged on Powell's breathing and shot pains through his chest. Powell complained but his complaints were ignored. After six hours he was released from his sheeted imprisonment but another wet-sheeted straitjacket was prepared. Powell protested but the attendant said: "We have orders to put you in another pack." Powell was calm, weak and cooperative, but under orders of Dr. Risser the attendants again bound him tightly and again tugged at the roped sheets to achieve the last inch of adhesive closeness. No one took his pulse, no one ascertained his temperature. He was placed into a tub of warm water which soon became hot. Again Powell's resulting protestations fell on deaf ears. Agonizing with pain, running with perspiration and tormented with unquenched thirst he screamed for relief which brought from the night supervisor the reproof: ". . . if you don't shut your . . . mouth, you'll stay in pack six hours later." Shortly after this, Powell fainted. When he revived, it was early morning.

It was apparent that the hermetically tight wrappings were interfering with the patient's blood circulation but neither of the defendant-doctors appeared upon the scene to examine, to inquire, to probe or investigate. At the end of the first pack, one of Powell's arms was in pain. At the end of the second pack, both arms were swollen and numb; his hands, which apparently received the full impact of the constriction, had "puffed" to twice their normal size. Again no doctor or nurse examined Powell at this juncture; again neither his pulse nor temperature was taken; again he was swathed in the binding sheets and again he was placed in the tub of hot water, in which he remained this time for five hours. When the vise-like sheets were removed at 2 o'clock in the afternoon, his hands were scarcely recognizable as hands.

Mrs. Norma Berg, the plaintiff's sister, in describing her brother's condition, said: "His hands were swollen two and half to three times their normal size and resembled two raw steaks. There were blisters in the center of both palms, about the size of a half-dollar, and other blisters over his hand and fingers."

One day Dr. Norman Daley opened some of the blisters on Powell's left hand with a pen knife taken from his pocket, and the swelling, which had started to recede, flared into aggravated size and color. The patient felt "drawing pains," "like electrical current going through, like my fingers were going to be drawn up." The fingers began to curl toward the palm.

Dr. Kerwin M. Marcks, a plastic surgeon, testified: "From my examination, I am definitely convinced that this deformity this man has was produced by some form of trauma." He further was of the opinion that the condition was caused by the impeded circulation of blood followed by infection resulting from the use of an unsterilized pocket knife.

Dr. Robert L. Schaeffer, chief surgeon of the Allentown Hospital, testified that in his expert opinion the deformity in Powell's hands "was caused by a cutting off of the blood supply to his hands."

The fear has been expressed by appellants that to allow a recovery in this case would be to subject doctors to vexatious and frequent litigation. This is a cloak of argument worn to confuse the unwary. The criticism of an individual member of a class does not condemn the whole class. Doctors have appeared in court before and some have won and some have lost the lawsuits in which they have been involved, but the medical profession did not, because of that litigation, lose dignity or prestige. In fact, down through the years the medical profession has continued to advance and progress until today it is recognized and respected as the greatest benefactor of mankind since the days of the Divine Physician who healed the sick and the weary, gave sight to the blind and lifted the dead from their graves. We are concerned here only with the alleged negligence of two particular men of medicine, and not the whole field of healing in which the disciples of Aesculapius plant the seeds of health, sanity and well-being. No gardener objects to the uprooting of toxic weeds; no doctor, including the two who are defendants in this civil case, will or should object to discarding methods and practices proved more disposed to break down vital tissue than to weave it into healthy and substantial muscle and flesh.

In caring for his patient, Reynold Powell, Dr. Risser failed to measure up to the medical standards legally expected of him. Although he testified he saw the plaintiff when he was in the first pack he did not note pulse or temperature, or see to it that they were recorded. Dr. H. F. Hoffman, superintendent of the Allentown State Hospital, testified that a patient's

temperature and pulse, while undergoing wet pack treatment, should be taken every 30 minutes. Dr. Risser did not meet the requirement of having this regulation observed.

It was not enough for Dr. Risser to look at a patient once, and then commit him to the machinery of an insane asylum without some periodical supervision to assure that the patient was not being torn between grinding gears of inattention or misbehavior. Although Dr. Risser had ordered the continuation of a very drastic treatment, he ignored the recipient of that treatment until he was brought before him for surgery after the third application of a therapeutic violence he himself had prescribed. Had he examined Powell after the second pack it is reasonable to assume he would have ordered either the discontinuation or modification of the treatment because the patient was displaying at that time vivid symptoms of distress and breakdown from the harsh measures being employed. Dr. Risser did not even know that Reynold Powell had fainted during the ordeal of the second pack, but it was within the periphery of his responsibility to ascertain what untoward results, if any, had followed the severe course of action he had dictated. He allowed Powell to go through the third crushing pack as a simple matter of routine: "Q. How did he get in the third pack? A. We consulted about this thing during the late evening, and I told Mr. Buck, 'If this young man's physical condition remains good and he is still violent and maniacal, you can go on with pack treatments until the following morning."

This testimony clearly establishes that Dr. Risser had prescribed a long range consuming treatment without providing for check-ups to assure himself that the continuation of that grim and painful cure might not achieve a result worse than the disease. He testified:

"Q. Before he went into the third pack, did someone report to you that he was still violent? A. I don't recall that. Q. Then why did you order the third pack? A. We know from experience the kind of treatment required in these cases."

Dr. Daley, the co-defendant, stated that the question as to whether a third pack should be prescribed was "a question of judgment, and at times pretty keen judgment." In spite of the high standard of wisdom needed to determine whether the harsh scouring regimen should be continued, neither one of the defendants made any effort to apply that wisdom. The fate of a helpless young man entrusted to their safekeeping was left in the hands of one without the capacity or responsibility to make the momentous decision: "Q. In this particular case, that judgment, which you say must be pretty keen, was left to the attendants? A. It was left to Mr. Buck, the night supervisor."

Dr. H. F. Hoffman, Superintendent of the Hospital, testified with regard to the direct responsibility of the physician in ordering wet packs: "Q. Do you agree that, before a doctor prescribes a wet pack, he should assure himself of the physical condition of the patient? A. I believe that a doctor would not prescribe a pack unless he felt it was the indicated treatment for the patient, which means the patient is in condition to take it."

Dr. Risser cannot shift his responsibility for Powell's condition to the night supervisor Buck. In the case of *Davis v. Kerr*, 239 Pa. 351, the defendant-doctor there attempted to escape accountability for a sponge left in the abdominal cavity of a surgical patient by blaming the fault on the nurse, but this Court said: "Neither does the defendant, nor a single witness in his behalf, undertake to give any explanation of the fact that here a sponge which *the defendant should*

*have removed* was allowed to remain, except to say that the nurses failed to keep accurate count . . . For all that appears in the case the retained sponges might readily have been discovered by the surgeon, and reasonable prudence and care on his part would have avoided the accident." (Emphasis supplied)

Had Dr. Risser here done his full duty toward the plaintiff, the third packing would not have taken place and the resulting injury would have been avoided, just as Dr. Kerr in the cited case would have avoided a lawsuit had he done his duty in making certain that no sponge had been left in his patient.

What caused Reynold Powell's injuries? It was testified that the wet pack treatment is normal procedure in a mental institution and that it is freely given without anticipative mishap. Since the plaintiff's injuries immediately followed the wet pack treatment, it is logical that he came to grief because of that treatment. Why? Was it because the wet packs were not needed at all? Was it because they were applied improperly? Was it because the patient's condition could not withstand them? The defendants had the duty to explain. We have repeatedly held that where the thing which causes the injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of events would not happen if the defendant, who has the management uses proper care, the burden is then placed on the defendant, not to explain the accident, but to show that he used due care.* Dr. Risser not only failed to show that he used due care, but he demonstrated with his own testimony that he omitted doing what the circumstances required him to do.

---

* *Maltz v. Carter*, 311 Pa. 550, *Knox v. Simmerman*, 301 Pa. 1.

With regard to the second defendant, Dr. Norman Daley, his legal negligence in cutting the defendant's left hand with an unsterilized pocket knife is a case as open-and-shut as the knife he used. Nothing can be more objectively associated with modern surgery, modern medicine and modern hospitals than the continuing, incessant sterilization of every instrument, glass, vessel and utensil which comes into contact with a patient's malady or wound. Every school child is taught the extreme value of hygiene, every housewife knows the absolute need for cleanliness in handling all items used in feeding her infants or caring for a sick one at home. Hence, it is not necessary to introduce expert testimony to show that the use of an unsterilized knife on an open injury will cause infection. In *Hodgson v. Bigelow*, 335 Pa. 497, 511, we quoted with approval from Herzog on "Medical Jurisprudence" (p. 168, sec. 192) : " 'The accepted rule is that negligence must be proved by expert medical testimony unless the negligence is so grossly apparent that a layman would have no difficulty in recognizing it.' "

In *Norwood v. Goeddel*, 58 Pa. Superior Ct. 500, the Superior Court said: "It is scarcely necessary to add that a physician who operates on a patient for an infectious trouble and then, without sterilizing his hands or instruments, operates on another patient, is guilty of negligence."

We do not know what Dr. Daley carried in the pocket which contained his penknife, but we can take judicial notice of the fact that the average professional man's pocket is capable of carrying cigarettes, matches, newspapers, letters, pencils, currency, coins and stamps. We also are aware that over a period of time a little of the gloss and minute particles from pocket contents rub off and accumulate into one collective substance known as "phlug." We don't know how much of this "phlug"

attached itself to the blade of Dr. Daley's pocketknife, but there is no assurance that that blade was not encrusted with the thousands, if not millions, of germs that scientists constantly tell us are in the air and on every unsterilized object. It was testified that the blisters on Powell's hands contained contamination which threatened the entire blood stream with a toxicity capable of causing death. For Dr. Daley to have opened those blisters with his penknife blade represents to me the epitome of culpable negligence for which he should be answerable to the plaintiff in a monetary verdict.

As I read the record, the conduct of both Dr. Risser and Dr. Daley offers no palliation or excuse. The sum of $5,000 is a small sum for them to pay to the plaintiff who has lost not only the sight of his mind but now, because of their negligence, has lost also the seeing dog of his faithful hands to feel his way along the rough and sorrowful road of life which lies before him.