## Rosenfeld v. Coleman

636

*S. Maxwell Flitter*, for plaintiff.

*Fox & Oldt*, for defendant.

PALMER, J., June 8, 1959.—This is a motion to strike off a compulsory nonsuit in a malpractice action wherein plaintiff alleges defendant-psychiatrist negligently caused him to become a narcotic addict.

Nonsuit was entered because the trial judge believed there was no competent evidence of negligence, plaintiff having failed to produce expert testimony as to the professional skill in the locality in which defendant practiced at the time, and there being insufficient evi-

dence that, in treating plaintiff, defendant violated the Anti-Narcotics Act of July 11, 1917, P. L. 758, as amended, 35 PS §851, etc., so as to permit the jury to find him negligent.

Having carefully considered the testimony together with the briefs and argument of counsel, we unanimously agree there is merit in at least a portion of plaintiff's contention and therefore his motion must be granted.

The law governing motions of this type is well settled. We must consider all facts and inferences thereon in the light most favorable to plaintiff (Kilpatrick v. Philadelphia Rapid Transit Co., 290 Pa. 288; Deemer v. Weaver, 324 Pa. 85; Wolansky v. Lawson, 389 Pa. 477), accepting as true all evidence which tends to support his case (Harper v. Philadelphia Rapid Transit Company, 258 Pa. 282; Malone v. Marano, 326 Pa. 316), giving him the advantage of every fair inference (Malone v. Marano, supra), rejecting antagonistic facts and inferences and resolving all doubts in favor of a jury trial: Malone v. Marano, supra.

Considering the testimony in this light, it appears that from 1945 plaintiff suffered migraine headaches, nervousness and general weakness for which he was treated by various physicians. On October 3, 1955, he consulted defendant, a physician specializing in neuropsychiatry, in the City of Easton, and became his patient.

At the end of October or beginning of November 1955, he complained of severe pains and defendant gave him a prescription for Demerol, a synthetic narcotic drug, and directed him to have the prescription filled at a drugstore, obtain a syringe and needles and return to defendant's office. Plaintiff did as he was directed and defendant then instructed him in the use

of the syringe and needles and told him he should administer the drug himself when he felt he needed it.

About three weeks later, defendant gave plaintiff another prescription for Demerol for self-injection. From October 3 until the time of this prescription, plaintiff visited defendant at his office and was treated psychiatrically; that is, he was asked questions which he answered to the best of his ability, and was counseled by defendant.

Shortly after receiving this second prescription, plaintiff telephoned defendant and told him he had pains and needed help. Upon defendant's instructions, he went to the latter's office where he was handed a Demerol prescription by the doctor, for which he paid $10. From then until May of 1956, plaintiff received no psychiatric treatment from defendant, but did procure from him many prescriptions for Demerol. At no time did defendant or his nurse make any of the injections; they were all made by plaintiff.

In response to an inquiry, defendant on April 25, 1956, addressed a letter to the Division of Narcotic Control of the Pennsylvania Department of Health, referring to plaintiff's addiction to Demerol and stating the prognosis was "not very good." He suggested: "My impression as a Neuro Psychiatrist is that we are dealing with not only an asociopathic behaviour disorder, addict, but his behaviour is that of a hypomanic pattern which at time I feel borders on Manic depressive Manic, type of affective disturbance."

In the same month defendant told plaintiff he was an addict and there was no help for him unless he went into a hospital. Defendant thereupon committed plaintiff to the Easton Hospital for a period of seven days during which he was withdrawn from the use of the drug. Upon his release, he felt an additional need for Demerol and was again furnished prescriptions by defendant.

Plaintiff testified he was not addicted to the use of the drug in October 1955, when he first visited defendant nor had he ever been so addicted. His testimony in this regard was corroborated by Dr. Joseph M. Brau, who had treated him since 1943. Specifically, Dr. Brau testified that when plaintiff first consulted defendant in October of 1955, which was immediately after plaintiff's last visit to Dr. Brau, he was not an addict.

It is undispted that plaintiff was addicted to the use of Demerol during the period when he was receiving prescriptions from defendant. He took treatments for withdrawal from its use from Dr. Raymond Wing, during the period October 30, 1956, to January 3, 1957.

Defendant was called as of cross-examination and testified that soon after he began to treat plaintiff in October 1955, the latter confessed he was a Demerol addict and requested prescriptions for the drug.

According to defendant, he felt his patient was suffering from a "psychopathic character disorder" and was "mentally ill." He later became interested in the Demerol addiction which he believed was a result of this mental illness. He prescribed the use of Demerol, which was not dangerous and from which, though habit forming, it was relatively simple to withdraw, to "help the psychotherapy." He tried through psychiatry to make plaintiff understand why he was an habitual user and believed if he were successful in curing the mental disorder, the Demerol addiction would terminate. He admitted the purpose of his treatment was both to cure plaintiff of his mental illness and also to remove him from the drug addiction. By prescribing the use of Demerol at plaintiff's request, he attempted to gain the good will of his patient and so effect a "transference" or "empathy" with him.

In order to get to a jury in Pennsylvania, a plaintiff in a malpractice action must offer expert testimony to establish the measure of professional skill required in

the locality at the time of the alleged malpractice. This view is summarized in the majority opinion in Robinson v. Wirts, 387 Pa. 291, 297, as follows: "It is thus abundantly clear that since, in all such malpractice cases involving an appraisal of the propriety and skill of a doctor or surgeon in his professional treatment of a patient, a lay jury would presumably lack the necessary knowledge and experience to render a just and proper decision, they must be guided by the testimony of witnesses having special or expert qualifications. The only exception to this otherwise invariable rule is in cases where the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of even non-professional persons, as, for example, where a gauze pad is left in the body of a patient following an operation (Davis v. Kerr, 239 Pa. 351, 86A.1007), or where a dentist, in working on a tooth, uses a tool with a small rotating emery disc at the end and allows it to slip and to remain revolving in the patient's mouth, grinding and tearing her tongue (Dux v. Shaver, 105 Pa. Superior Ct. 344, 161 A. 481). So, likewise, there might be imagined a case where a surgeon engaged in removing a tumor from a patient's scalp would let his knife slip and cut off his patient's ear, or where he undertook to stitch a wound on his patient's cheek and by an awkward move would thrust his needle into the patient's eye. It would be a matter of common knowledge and observation that such things do not ordinarily attend the service of one exercising ordinary skill and experience in the work of surgery because they involve ulterior or extraneous act or omissions the judgment of which would not require scientific opinion." Accord Bierstein v. Whitman, 360 Pa. 537; Scacchi v. Montgomery, 365 Pa. 377; Powell v. Risser, 375 Pa. 60.

The psychiatric treatment of this plaintiff by this defendant was not "so simple" nor "the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of even non-professional persons."

Plaintiff's failure to produce such expert testimony, however, is immaterial since there was sufficient evidence of negligence to go to the jury, if the latter believed defendant had violated the provisions of the Anti-Narcotics Act.

Section 1 of that statute, as amended, 35 PS §851, defines "Drugs" as follows:

"Except as limited in section two of this act, the word 'drug', as used in this act, shall be construed to include: (a) opium; or (b) coca leaves; or (c) marihuana; (d) any compound or derivative of opium, coca leaves, or marihuana; or (e) any substance or preparation containing opium, coca leaves, or marihuana; or (f) any substance or preparation containing any compounds or derivative of opium, coca leaves, or marihuana *and any substance identified chemically as 1-methyl-4-phenylpiperidine-4-carboxylic acid ethel ester, or any salt or derivative thereof, by whatever trade name designated,* or any preparation containing such substance or its salts or derivatives or any substance or preparation containing any drug found by the United States Secretary of the Treasury, after due notice and opportunity for public hearing, to have an addiction forming or addiction-sustaining liability similar to morphine or cocaine and proclaimed by the president to have been so found by the secretary." (Italics supplied).

The chemical composition of Demerol nowhere appears in the testimony. However, we know it is the name of a synthetic drug of the Meperidine family, manufactured by Winthrop Laboratories, New York,

N. Y., and Windsor, Ontario, with the following chemical content: Ethyl 1-methyl-4-phenylpiperidine-4-carboxylate hydrochloride: Modern Drug Encyclopedia and Therapeutic Index, 6th Ed., p. 297, Drug Publications, Inc. (1955).[1]

The case was tried partially on the theory that defendant had violated section 8 of the Anti-Narcotics Act. In his complaint plaintiff alleged the violation of this act and in oral argument prior to granting the nonsuit, his counsel stated, without objection, that Demerol was one of the drugs included in the statute.

Generally, on appeal, the court will not take judicial notice of matters not appearing in the record. However, where there are undisputed physical facts clearly shown in evidence, our Supreme Court has held that on appeal the court should take judicial notice of the laws of nature or mathematics or quality of matter, or whatever it may be that rules the case, and apply it as the trial court should have done: Lessig v. Reading Transit & Light Co., 270 Pa. 299, 303; Horen v. Davis, 274 Pa. 244.

In the absence of proof, a trial judge generally is not authorized to take judicial cognizance of the precise meaning of technical terms: 20 Am. Jur. §67, p. 89. See also Mears v. Humboldt Ins. Co., 92 Pa. 15. On the other hand, the tendency has been to expand the area in which judicial notice will be taken of scientific facts.[2]

---

[1] See also the definition of Meperidine hydrochloride contained in Volume XV Pharmacopeia of the United States, 15th Revision, at p. 397, and descriptive literature contained in cardboard container for each bottle of Demerol produced by Winthrop Laboratories.

[2] For example, in Sinkiewicz v. Susquehanna Collieries Company, 115 Pa. Superior Ct. 377, the court noted: "It is a well known scientific fact that dynamite is nitroglycerin absorbed in a porous material and that when discharged it gives off large volumes of

The failure of the record to reflect the chemical composition of Demerol was, at most, an oversight. It is, however, a physical fact which cannot be disputed and therefore is readily capable of judicial notice. We believe it would be a miscarriage of justice to deny this plaintiff the opportunity of having his case passed upon by a jury solely because the chemical composition of the drug in question does not appear in evidence. We therefore hold that Demerol is a "drug" within the definition of that term in the statute.

Section 8 of the Anti-Narcotics Act provides, in part, as follows, 35 PS §860:

"No physician . . . shall . . . prescribe any of said drugs to any person known to such physician . . . to be an habitual user of any said drugs, unless said drug is prescribed . . . for the cure or treatment of some malady other than the drug habit. . . . In the treatment of drug addiction as such, narcotics must not be furnished either on dispensing or prescribing in writing by physicians to the addict himself, but must be personally administered by the physician, or be placed in the hands of a nurse, or other reliable person who is not an addict and who is held personally responsible for carrying out the directions of the physician in charge. Written records must be kept of all such administration of narcotics. In every such case the physician shall himself make a physical examination of the patient and shall report, in writing, within seventy-two hours, to the Department of Health, the name and address of such patient, together with his diagnosis of the case and the amount and nature of the drug prescribed or dispensed in the first treatment. When the patient leaves his care,

poisonous gases." (Syllabus.) See also Washington State Apple Advertising Commission v. Federal Security Administrator, 156 F. 2d 589, where judicial notice was taken of the fact that fluorine and cryolite are not the same substance.

such physician shall report, in writing, within seventy-two hours, to the Department of Health the result of his said treatment."

It will be recalled that plaintiff called defendant as of cross-examination. Defendant testified that plaintiff told him late in October or early November 1955, he was addicted to the use of Demerol. Defendant believed if he was able to affect a cure of plaintiff's mental illness, the Demerol addiction would also be cured, since in his opinion the addiction was the result of the mental illness. He also testified the purpose of his treatment was to cure plaintiff of both his mental illness and his drug addiction.

Plaintiff testified that at the time he first went to the defendant for treatment, he was not addicted to the use of Demerol and he became addicted only while being treated by the doctor and receiving prescriptions from him. He claimed defendant treated him psychiatrically for but a brief period after his initial visit and thereafter he received no psychiatric treatment but rather bought Demerol prescriptions from the doctor. By April 1956, both plaintiff and defendant recognized plaintiff was an habitual user and defendant continued thereafter to prescribe Demerol.

One of the purposes of defendant's treatment was to cure plaintiff's drug addiction. We do not believe the legislature intended to prohibit physicians from prescribing narcotic drugs to known habitual users only where the purpose of such prescriptions is exclusively to cure the addiction. If one of the purposes is to cure the addiction, it would appear to fall within the prohibitory section of the act. Similarly, if one of the purposes of prescribing the drug is to cure a known habitual user from his addiction, the treatment is for drug addiction "as such," as those words are used in section 8 of the act.

Considering the testimony in the light most favorable to plaintiff, we believe, therefore, there was sufficient evidence to permit the jury to determine whether defendant prescribed Demerol "for the cure or treatment of some malady *other than* the drug habit" and also whether defendant was treating plaintiff for "drug addiction *as such*" so as to come within the prohibition of section 8 of the statute.

The provisions of this section are mandatory and if the jury found defendant had failed to comply with the duties imposed thereby and as a result plaintiff, without negligence on his part, was injured, the violation of the statute would constitute sufficient evidence of negligence to permit the jury to render a verdict in plaintiff's favor.

The tests for determining whether the violation of a statute constitutes actionable negligence are set forth in §286, A. L. I. Restatement of the Law of Torts, as follows:

"The violation of a legislative enactment by doing a prohibited act, or by failing to do a required act, makes the actor liable for an invasion of an interest of another if:

"(a) the intent of the enactment is exclusively or in part to protect an interest of the other as an individual; and

"(b) the interest invaded is one which the enactment is intended to protect; and

"(c) where the enactment is intended to protect an interest from a particular hazard, the invasion of the interests results from that hazard; and,

"(d) the violation is a legal cause of the invasion, and the other has not so conducted himself as to disable himself from maintaining an action."

This section has frequently been cited with approval by our appellate courts.[3]

As expressed in its title, the purpose of the act is to protect "the public health by regulating the possession, control, dealing in, giving away, delivery, dispensing, administering, prescribing, and use of certain drugs . . ." Clearly one of the intentions of the legislature was to regulate and control the use of narcotics by a known user by preventing him from administering drugs to himself. Plaintiff was a known user and therefore it was the intent of the statute to protect his interest as an individual. This interest was one which the statute was intended to protect. We further believe the act was intended to protect a known user, such as plaintiff, from continued or excessive use of the drug and the jury could find the violation of the statutory duty was the proximate cause of the harm, assuming of course it also would find defendant knew plaintiff was an habitual user at the time he prescribed Demerol for him, and thereafter continued to prescribe the drug.

We believe, therefore, the jury should have been permitted to determine whether defendant violated the provisions of section 8 of the Anti-Narcotics Act. We further believe, if the jury found defendant violated the statute, it would be enough evidence of negligence to support a verdict for plaintiff.

For these reasons, plaintiff's motion to strike off the nonsuit must be granted.

*Order*

And now, June 8, 1959, plaintiff's motion to strike off the compulsory nonsuit hitherto entered against him is granted.

---

[3] Nixon v. Chiarilli, 385 Pa. 218; Fisher v. Hill, 362 Pa. 286; Ennis v. Atkin, 354 Pa. 165; D'Ambrosio v. Philadelphia, 354 Pa. 403; Price v. New Castle Refractories Company, 332 Pa 507; Jinks v. Currie, 324 Pa. 532; Gaskill v. Melella, 144 Pa. Superior Ct. 78.