## Leonardo v. Sloan

*Donald M. Miller, James R. Edgerly* and *John W. Taylor* and *Myers, Taylor & Peduzzi,* for plaintiff.

*Arnold D. Smorto* and *Smorto & Creany,* for defendant.

MCDONALD, J., August 31, 1959.—Plaintiff filed an action in trespass against defendant, a physician, alleging that defendant had injured him by negligent X-ray treatments.

In brief, plaintiff claims he was treated by defendant

with X-ray and ultraviolet ray therapy for sciatic neuritis during the period June 15, 1955, until May 27, 1956. He received 30 to 35 X-ray treatments to the left hip, or buttock, the last exposure on March 20, 1956. At the time, a discoloration was noted on the buttock and by May 28, 1956, it had developed into a third degree burn. He was confined to Indiana Hospital for a period of 169 days where he underwent an operation and a series of skin grafts.

As a result of the injuries which he claims resulted from defendant's negligence, plaintiff seeks to recover his medical, surgical and hospital expenses, $2,654.05; loss of earnings, $4,500, and an amount for pain, suffering and loss of earning capacity.

The case was tried to a jury and a verdict of $18,500 rendered.

Defendant has filed motions for new trial and judgment n. o. v., urging as reasons therefor, in addition to the refusal of the trial judge to grant a motion for binding instructions, that the verdict was against the evidence, the weight of the evidence, the charge of the trial judge and the law. At the argument and in his brief, defendant contended; (1) Judgment n. o. v. should be granted because the court erred in admitting the expert opinion of Doctor Robert M. Jacobson, a radiologist, without proper foundation; (2) a new trial should be granted because plaintiff, by his actions aggravated his condition, thus causing his own injury; (3) the verdict is excessive and should be reduced.

This matter is now before the court on defendant's motions for new trial and judgment n. o. v.

Whether or not judgment notwithstanding the verdict should be granted depends largely upon the testimony of Doctor Robert M. Jacobson, the radiologist, called for the purpose of establishing that the X-ray treatment of plaintiff by defendant was negligent. The

testimony of plaintiff and several medical witnesses who had examined and treated him, is also pertinent to this inquiry.

Plaintiff testified that during the course of treatment covering eight months, he had been exposed to X-ray radiation on his left hip, calf and heel 42 times for periods varying from 15 to 20 minutes initially and later increased 30 to 35 minutes. He estimated the number of exposures to the hip as 30 to 35. The exposure of each area was about 10 minutes during each treatment. At times, however, because of increased pain, the exposure to the hip was duplicated. He stated that he usually remained at the doctor's office about three to three and one-half hours for each treatment. During this time he remained on the X-ray apparatus while the doctor treated other patients. He also received ultraviolet ray therapy during these visits. The X-ray equipment was approximately six to eight inches from the treated portion of his body and the greatest exposure was to his hip because of the concentration of pain at this portion of his body.

During the time he was confined to the Indiana Hospital for treatment of the burns, he admits leaving for a period of two days without authorization. He denies being a difficult patient but admits he was unable to eat the hospital food because of loss of appetite caused by the narcotics administered to relieve pain. In early November he was released from the hospital for a period of two weeks and then returned until December 2nd, when he was finally discharged. Thereafter, he returned as an out-patient for treatment.

Doctor Daniel H. Bee, a physician of long standing, testified that he had examined plaintiff in March 1955 and diagnosed his ailment as sciatic neuritis. On May 28, 1956, he was called to plaintiff's home and examined a large burned area on his left buttock. He

described it as about eight by eight inches, with a redness or erythema and a three-inch border around the edge. In his opinion it was an X-ray burn.

After admitting plaintiff to the hospital, he treated him with a foile dressing. He was in pain and sedatives were prescribed. On June 30, 1956, when plaintiff left the hospital without permission, there was little change in the condition and he appeared to have more pain. On his return two days later, he was again examined and no change noted in the condition. The patient was transferred to Doctor T. W. Kredel for surgery. When Doctor Bee examined him in 1958, it was his opinion he was suffering from dermatitis of the left buttock and he referred him to Doctor A. J. Edelstein, a dermatologist.

Doctor T. W. Kredel, a physician and surgeon whose qualifications are admitted by defendant, examined plaintiff on May 30, 1956, and diagnosed the condition as an X-ray burn. He again examined him on July 2, 1956, (after plaintiff's two days absence from the hospital) and the condition appeared to be the same as when first examined.

On August 28, 1956, he excised the dead tissue including skin, superficial fascia and fatty tissue. On October 4th, he began a series of skin grafts. At the trial, Doctor Kredel examined plaintiff and testified that, while there were changes in the skin since his last examination in May 1957, he found no tenderness and the result was good. His prognosis at that time was extremely guarded since in his words, "the condition may flare up at any time."

While Doctor Kredel testified plaintiff was a troublesome patient in the hospital, despite the one occasion he knew of his removing a dressing and failure to maintain his diet, the result would have been the same.

Doctor Robert M. Jacobson, a radiologist primarily

engaged in diagnostic and theraputic radiology since 1938, and whose qualifications are admitted by defendant, examined plaintiff on June 11, 1956. He diagnosed the condition as a first degree burn. He now admits his diagnosis was incorrect and in view of the subsequent developments, the condition had developed into a third degree burn from the accumulative effect of radiation.

Doctor Jacobson testified he is familiar with the skill and diligence required in the profession in the use of X-ray therapy. According to him, in treating sciatic neuritis over a period of 42 weeks, the greatest amount of even low voltage treatments should not exceed 10 exposures, and it would be unsafe, because of the accumulative effect of X-ray, to administer a greater number of treatments. In his opinion, 24 or 25 treatments administered during a period of eight months would not be in keeping with the skill and diligence exercised by the profession. He bases his opinion on an exposure of 1 minute and 39 seconds with an average of 100 amperes. This according to him is the usual dosage. If the exposure is longer, the number of treatments must then be reduced.

He admits a browning of the skin may not indicate negligent application, although it would indicate the patient had "quite a bit of X-ray." He also states it would be impossible for a patient to know the length of exposure because the machine may be running without emitting rays. He admits it would be helpful in determining whether the exposure was negligent, to know the target distance, the milliamperage, kilovoltage and the type of cone used. However, while it would be helpful to know these factors and thereby to compute the output in roentgen units, it would not be safe to give a greater number than 10 to 12 exposures even with a low output.

Doctor A. J. Edelstein, a dermatologist, whose

qualifications are admitted by defendant, testified that he had examined plaintiff on September 19, 1958, after referral by Doctor Bee. He diagnosed his condition as chronic radiodermatitis of the left buttock, calf and heel which had existed over a long period of time and was not in the acute stage. He further stated that pigmentation itself would not be significant since it could be produced by an output of 75 roentgen units depending on the radiosensitivity of the subject. In such case, the condition would be transient. However, where other developments are noted, such as in the condition of plaintiff, it was caused by increased radiation exposure.

Doctors Bee, Kredel and Edelstein all testified that there is a high possibility or probability of skin cancer developing from plaintiff's present condition.

Defendant testified he has been a practicing physician since 1928 in Barnesboro, Cambria County, having graduated from Hahnemann Medical College in 1927. He began using X-ray equipment for photography and diagnostic purposes in 1929. For a period of two years, three times weekly, he studied X-ray technique at Shadyside Hospital in Pittsburgh and for a period of six years, one day per week, at Allegheny General Hospital in the same city. He has attended radiological meetings but has not taken the board examination. He states that he has treated hundreds of persons for sciatic neuritis by X-ray therapy.

Defendant first examined plaintiff on June 15, 1955, and diagnosed his condition as sciatic neuritis. X-ray and ultraviolet ray treatments were given immediately to the three areas of the sciatic nerve, left hip, calf and heel. During the period from June 15, 1955, to February 23, 1956, he administered 27 applications of X-ray with an exposure of one minute each time. The formula used was 15.6 roentgen units

at a target distance of 14 inches with a lead cone and aluminum filter. The charge was 5 milliamperes and 100 kilovolts. After February 23, 1956, when the patient failed to respond, the X-ray treatment was discontinued. During the X-ray treatment he claimed a dosimeter was used several times each week to determine the output of the machine, although it was not used for each patient. The target distance was determined by relying on his knowledge of the machine and "mostly always measured," with a yard stick or markings on the machine.

He further testified that on April 26, 1956, plaintiff was made ready for an ultraviolet lamp treatment and the time clock set at four minutes; that he was called to attend an emergency case in his upstairs office but before leaving, instructed plaintiff that if the treatment were to be given, the lamp would have to be turned off in four minutes. He said plaintiff agreed to do so. Upon his return one hour later, he found plaintiff still under the lamp and he then warned him that a burn would result. Thereafter, a pigmentation developed on the left buttock and later he noted blisters which eventually excreted serum and became dry. He treated plaintiff with an application of salve dressing on subsequent visits to the office until May 26th.

In summary, defendant says, in his professional opinion, the 27 treatments given were not excessive or negligent, that the total accumulative effect of the X-ray was about 497 roentgen units, and this would not produce a reaction or redding of the skin. He agrees that if plaintiff had been exposed for 12 minutes at the 15.6 roentgen units output, for a period of three or four consecutive weeks, he would "burn terrible."

Defendant offered testimony by Theodore P. Sopp

a radiological physicist. His testimony is highly technical and probably offered some help to the jury in understanding the theories and mechanics of the use of X-ray machines. However, while the testimony corroborated in many features that of Doctor Jacobson and defendant, it aids but little in determining the issues now before the court. In fact, neither plaintiff nor defendant, has used this extensive testimony in argument or brief.

In considering a motion for judgment notwithstanding the verdict, the testimony must be viewed in the light most advantageous to the party who has the verdict, giving him the benefit of every reasonable inference of fact arising therefrom and resolving any conflict in his favor: Richardson v. Wilkes-Barre Transit Corp., 172 Pa. Superior Ct. 636; Bowman v. Press Publishing Co., 316 Pa. 531. A judgment notwithstanding the verdict may only be entered when the trial judge, at the close of trial, should have given binding instructions: Hahn v. Anderson, 123 Pa. Superior Ct. 442; Santere v. Reading Co., 170 Pa. Superior Ct. 57. It can only be entered in a clear case where no essential facts are in dispute: Pantuso v. Pittsburgh Motor Coach Co., 360 Pa. 464; Marks v. Lumbermen's Insurance Co. of Philadelphia, 160 Pa. Superior Ct. 66.

The question raised by the motion for judgment n. o. v. is whether there was sufficient evidence to submit to the jury the question of defendant's negligence in the treatment of plaintiff by X-ray.

A physician or surgeon is required in the treatment of patients to use such reasonable skill and diligence as is ordinarily exercised in his profession: Duckworth v. Bennett, 320 Pa. 47; Saltzer v. Reckord, 319 Pa. 208. In the use of X-ray equipment, the same standard is applied: Stemmons v. Turner, 274 Pa. 228.

In order to prove negligence by showing a failure

to exercise the duty of care above, expert medical testimony is necessary: Powell v. Risser, 375 Pa. 60; Scacchi, Admr. v. Montgomery, 365 Pa. 60; Bierstein v. Whitman, 360 Pa. 537; Wohlert v. Seibert, 23 Pa. Superior Ct. 213.

In this case, three competent physicians, one a radiologist, testified that plaintiff had suffered a third degree burn as a result of X-ray exposure. In addition, a dermatologist testified that the condition of plaintiff, observed by him over two years later, after surgery and skin grafts, was caused by radiation exposure.

Defendant admits that plaintiff was given 27 treatments, although plaintiff claims it was 30 to 35. This continued over a period from June 15, 1955, to March 20, 1956, according to plaintiff (to February 23, 1956, by testimony of defendant). Defendant states the exposure on each occasion was only one minute at a low output of roentgen units with no duplication of treatments on any one occasion at any of the three ports, or treated portions of plaintiff's body. According to him, this was not an excessive exposure. Plaintiff claimed the exposure varying from 15 to 20 minutes initially was increased to 30 to 35 minutes as treatment progressed, and this time was divided between the three ports, buttock, calf and heel. At times according to him, because of the pain in his hip, treatments were duplicated at this port.

There is no denial that on four occasions pigmentation developed, twice on the calf and twice on the buttock. Each time it cleared up in three or four weeks. However, the last pigmentation which appeared was larger and developed into pimples which excreted a serum. From the time this infected area developed until the operation and skin grafts, necrosis of the tissue was apparent and great pain resulted to plaintiff.

There is no doubt the present condition of plaintiff had its incipience in the initial pigmentation, erythema and blistering which developed into a third degree burn.

Defendant testified that plaintiff's condition resulted from his overexposure to the ultraviolet ray on April 26, 1956, in his office. At that time, he said plaintiff had voluntarily agreed to turn off the ray when defendant was called from the room to go on an emergency case. He failed, however, to do so and suffered an overexposure causing a reaction.

Since neither the doctrine of res ipsa loquitur nor of exclusive control applies to cases of this kind (Powell v. Risser, supra, Biersten v. Whitman, supra), it was the burden of plaintiff to prove that his injury resulted from the negligence of defendant in failing to use reasonable skill and diligence ordinarily exercised in the profession. The mere proof of injury would not, in the absence of expert medical testimony, sustain this burden.

Doctor Jacobson, a competent and experienced radiologist, with more than 20 years experience in diagnostic and therapeutic radiology, testified that in X-ray treatment for sciatic neuritis over a period of eight months, a skilled radiologist would not administer in excess of 10 to 12 treatments. In his opinion, 24 or 25 treatments (defendant admits giving 27 treatments) would not be in keeping with the skill and diligence exercised by the profession. This opinion was based on the use of 100 amperes at an exposure of 1 minute 39 seconds each time which is usual. He admitted, during a capable and vigorous cross-examination, that knowledge of the roentgen unit output, computed on the basis of target distance, filter, cone, milliamperage and kilovoltage, would be helpful in determining the total exposure. However, his opinion as to the number

of exposures at even a low roentgen output remained unshakened. These admissions, elicited during cross-examination, could be considered by the jury as affecting the weight of his testimony but did not render inadmissible his expert opinion given in direct examination: Cox v. Woodlands Cemetery Co., 133 Pa. Superior Ct. 313.

It would be grossly unjust and a tremendous handicap in cases of this type, where injury results from the use of an instrumentality so highly technical in its operation and solely and exclusively under the control of defendant, to require plaintiff to provide all the data of an intricate, scientific formula as a basis of a hypothetical question. While we realize the pitfalls of the doctrine of exclusive control in cases of this type and the reluctance of the appellate courts to make this an exception, nevertheless, to further bind plaintiff, as defendant here seeks to do, with the requirement that all pertinent data of the formula must be included in the hypothetical question to an expert testifying as to a standard of skill and diligence in the profession, would require that he follow the perilous practice of calling defendant as if on cross-examination.

The testimony of plaintiff, even though a layman, as to the number of exposures, the target distance at time of exposure, the manifestations of injury, together with the expert medical opinions of three physicians as to the type of injury and its cause, certainly builds a firm foundation upon which an expert may base his opinion as to whether or not defendant used that reasonable skill and diligence required in the profession. Factual issues are raised by this testimony, and even though plaintiff may not have had knowledge of the formula used and the length of exposure in the administration of the X-ray treatments, his testimony may be considered by the jury. The court may not say it is of no probative value.

While our research and that of counsel for the parties has failed to disclose a Pennsylvania decision similar to the facts in the case at bar, the court in the case of Ballance v. Dunnington, 241 Mich. 383, 217 N. W. 329, discusses the question at issue here. In ruling upon a hypothetical question asked of an expert and embracing plaintiff's testimony as to the time of exposure and other relative factors, the court stated (pp. 386-387) :

"The standard of care, skill, and diligence required of an X-ray operator is not fixed by the *ipse dixit* of an expert, but by the care, skill, and diligence ordinarily possessed and exercised by others in the same line of practice and work in similar localities. We pass the form of the question and the nature of the answer and hold there was no reversible error, for the reason that the question was based on the testimony of plaintiff relative to the period he was exposed to the X-ray, and which, if true, . . . stated an exposure for a period even the merest tyro would know was improper, and every witness, including defendant, said such a dosage would have been improper. Defendant denied any such dosage. . . .

"In considering a challenged hypothetical question we can give no thought to the weight of the testimony, for, if there is any competent testimony supporting the asserted facts, the question goes to the jury."

We conclude, therefore that Doctor Jacobson was a competent witness and his testimony admissible. In our opinion, the question of defendant's negligence was properly submitted to the jury in a full and complete charge to which objection has not been made. Therefore, defendant's motion for judgment non obstante veredicto must be dismissed.

In his motion for a new trial, defendant argued that it should be awarded in the interest of justice because plaintiff, by his own actions, aggravated his condition.

His contention is based largely on the incident referred to in the summary of testimony above, when plaintiff, after his confinement to Indiana Hospital for a period of one month, left without permission of his physician. He remained home for a period of two days and then returned to the hospital. Defendant also points out that plaintiff had failed to adhere to the hospital diet routine on occasions and in one incident, about two weeks after the skin grafts, removed the dressing.

As stated above, three physicians, Doctors Bee, Kredel and Jacobson had examined plaintiff upon his admission to the hospital or shortly thereafter. His condition was diagnosed as a third degree burn. According to Doctor Bee, at the time plaintiff left the hospital June 30th, there was little change in his condition and he appeared to have more pain. On his return two days later, he was again examined by Doctors Bee and Kredel and no change was noted in his condition. It would seem, therefore, that the unauthorized absence of plaintiff from the hospital for a period of two days did not contribute to, or aggravate, an already serious condition. Although Doctor Kredel testified that plaintiff was a troublesome patient, nevertheless, despite his failure at time to adhere to the diet and the one incident when he removed his dressing, according to him, the result of recovery would have been the same.

The trial judge in his charge detailed the various incidents upon which defendant now relies for a new trial and fully instructed the jury that if these in any way contributed to plaintiff's condition, he was not entitled to recover. If anything, the charge in this respect was highly favorable to defendant, because he produced no testimony of aggravation. It was for the jury to consider whether the actions of plaintiff aggravated his injury. This court may not, without

usurping the jury function, set aside the verdict and award a new trial.

Defendant argues that the amount of the verdict should be reduced because: (a) plaintiff aggravated his own condition and retarded his recovery; (b) the existing sciatic condition of itself would have prevented him working regularly; (c) plaintiff sought to establish damages by a copy of his 1955 income tax return without producing returns for previous years and said return had erasures on it.

The amount of a verdict will not be reduced, or a new trial granted for this reason, unless it is so grossly excessive as to shock the court's sense of justice (Fasick v. Byerly, 331 Pa. 85; Whinney v. Reading Co., 95 Pa. Superior Ct. 135), or offends the conscience and judgment of the court: Shark v. Lehigh Foundries, Inc., 388 Pa. 1.

In the case at bar, the jury decided defendant was negligent and that negligence resulted in injury to plaintiff. As a measure of damages they considered the medical expenses of $2,654.05. Plaintiff was confined to the hospital for a period of 169 days. He underwent an operation and a series of skin grafts.

Not only plaintiff but medical witnesses, who administered sedatives over a long period of time, testified to the constant pain suffered by plaintiff. In addition, he must face the nerve-racking spectre of cancer in an uncertain future. There is testimony that he is now nervous, irritable and subject to moods of despondency.

Plaintiff claims to have suffered a loss of earning capacity. In the opinion of Doctor Kredel, he will not be able to work as he did before the injury. His son graphically explained how he could lay a foundation in a day; now his ability to perform such feats is greatly curtailed.

There was produced in evidence a copy of plaintiff's 1955 income tax return showing a gross income for six

months work, of $3,000. True, this is not conclusive evidence of his loss of wages, but it is some evidence. During the time he was hospitalized and thereafter for a period of six months or more, he was unable to work. He claims work was available at the prevailing rate of $2.50 or $3 per hour. In a case such as this, where plaintiff is self employed, the exact loss of wages cannot be reduced to a mathematical certainty. However, the jury may use reason and common sense in reviewing the evidence and arrive at a just compensation.

The jury was instructed on all elements of damages of which there was evidence. No objection was made to the charge of the trial judge.

The amount of damages was for the jury to determine. The element of auto-aggravation of the injury, reduction of earning capacity by the sciatic neuritis, pain and suffering, loss of earnings and medical expenses were all considered. The award certainly does not shock our sense of justice; indeed, as suggested by plaintiff, it may have successfully been questioned as inadequate under all the evidence.

We are satisfied the verdict was not against the evidence, the weight of the evidence, the law or the charge of the court. It was, under all the evidence and in the opinion of the court, a proper verdict, although moderate in amount. Therefore, we make the following

*Order*

Now, August 31, 1959, after argument, consideration of briefs and the record, the motions of defendant for new trial and judgment non obstante veredicto are dismissed.