Yorston *v.* Pennell, Appellant.

Argued January 5, 1959; reargued June 30, 1959. Before JONES, C.J., BELL, MUSMANNO, JONES, COHEN, BOK and MCBRIDE, JJ.

*Philip H. Strubing,* with him *K. Robert Conrad, Wilbur H. Haines, Jr.,* and *Pepper, Bodine, Frick, Scheetz & Hamilton,* for appellant.

*Jerome H. Ellis,* with him *Leon Rosenfield,* for appellee.

OPINION BY MR. JUSTICE MCBRIDE, July 2, 1959 :

This is an appeal by defendant from the judgment on a verdict in favor of the plaintiff in a malpractice action against a staff surgeon at Episcopal Hospital, Philadelphia.

Originally plaintiff included the hospital as a party defendant but, upon preliminary objection that as a charitable institution it was immune from liability for the torts of its servants, the suit against the hospital was discontinued.

In the court below defendant abandoned his motion for new trial and contends only that he is entitled to judgment n.o.v.

It is clear, therefore, that we must consider only the evidence which supports the verdict and reject any evidence to the contrary, *Acchione v. Acchione,* 376 Pa. 36, 101 A. 2d 642; *Beatty v. Hoff,* 382 Pa. 173, 114 A. 2d 173, 178.

Plaintiff based his claim of negligence on two separate grounds: (1) defendant's personal negligence; and (2) defendant's responsibility for the negligence of his agents in accordance with the principle of *respondeat superior.* At the trial, the court below submitted the case to the jury only on the second ground. However,

in considering defendant's motion for judgment n.o.v. the court en banc relied on both theories.

If the evidence justified submission to the jury on the basis of *respondeat superior* then the action of the court below must be affirmed. However, if the judgment of the court below can be supported only on the evidence of direct negligence of defendant then the judgment cannot stand since this issue was not submitted to the jury. In that event, however, it would be improper for us to decide this appeal on the sole issue of whether defendant is entitled to judgment n.o.v. notwithstanding the fact that neither party has asked for the grant of a new trial.

On September 13, 1956, plaintiff was working for the Baton Construction Company, when a nail ricocheted from a ramset gun he was using, entered his right leg and fractured the fibula. He was brought to the receiving ward of Episcopal Hospital between 2 and 3 p.m. The gist of his complaint is that thereafter he became the patient of defendant, Dr. Edgar L. Pennell, Jr., who negligently permitted his agents and servants to prescribe penicillin for plaintiff although they knew or should have known that plaintiff was allergic to this drug, as a result of which plaintiff sustained serious permanent injuries. The injuries were clearly proved and there is no contention but that they were caused by the penicillin. The real question is whether the defendant, who denied agency and put negligence in issue under Rule 1045, is responsible.

The surgical staff of Episcopal Hospital was, at this time, divided into two sections, A and B. They alternated, for periods of six weeks, in the duties of attending patients such as plaintiff brought into the hospital for surgery. Surgical Service B was composed of approximately ten persons who were either surgeons, residents or interns. Dr. Pennell, like the other staff

surgeons or associates, received his appointment to Surgical Service B from the Board of Managers of Episcopal Hospital. Neither he nor the other associates were paid any compensation by the hospital. Dr. Pennell maintained his principal office at the hospital, for which he paid rent. He was entitled to charge fees from patients who could afford to pay them and from insurance companies in cases involving workmen's compensation, such as that of plaintiff.

Resident physicians, among them Dr. Mohammad Hatemazadeh, usually referred to as Dr. Hatemi, were appointed by the Board of Managers and were paid a full time employee's salary by the hospital and were assigned by the hospital to a particular service. An associate surgeon had no power to discharge any resident. No surgical resident could perform operations without the permission of a staff surgeon of his service. Dr. Hatemi regarded Dr. Pennell as being more active than any other one of the associates under whom he served and spoke of him as his "whole boss" and as his "teacher". Interns were appointed by the Board of Managers, were paid a salary, and were full time employees of the hospital. They could not be discharged by an associate surgeon. Junior interns, including a Mr. Rex, were hired by the assistant to the director of the hospital and were paid by the hospital. These were fourth year medical students who substituted for and performed the duties of interns.

A few months before his accident plaintiff had contracted a virus condition. His family physician, Dr. Katzman, had given him one injection of penicillin in treating him for it. Plaintiff developed a skin rash resulting from an allergy to this drug, whereupon Dr. Katzman discontinued its use and wrote a note on one of his prescription blanks which stated that plaintiff was allergic to penicillin and that he was never to re-

ceive that drug under any circumstances. Plaintiff put the note in his wallet and on Dr. Katzman's instructions kept it with him. He had it with him when he arrived at the hospital on September 13, 1956.

While plaintiff was in the receiving ward he showed the note to one of the nurses and to Rex, the junior intern. Plaintiff's wife, who had arrived shortly after plaintiff, also showed the note to one of the nurses, and she told Dr. Washington, an intern, that there was a note about an allergy which she had given to the nurse and also that plaintiff was allergic to tetanus antitoxin.

Since plaintiff also advised Rex about an allergy to tetanus antitoxin, a skin test was made which proved negative. Tetanus antitoxin was therefore administered. No test was made for allergy to penicillin although there is testimony in the record from Dr. Gottlieb, an allergy specialist, that tests can be made for allergies to various types of penicillin.

Plaintiff remained in the receiving ward about four hours. During this time Dr. Pennell came there and plaintiff's wife spoke to him, complaining about the long time plaintiff was kept waiting to have the nail taken out of his leg.

While plaintiff was still in the receiving ward, Dr. Hatemi was called to the ward. Dr. Hatemi was at that time a graduate of a medical school in Iran; had spent a one year internship in Quonset City Hospital in Boston, Massachusetts; and then had come to Philadelphia and been appointed a surgical resident at Episcopal Hospital. Upon his appointment he had applied, on July 4, 1956, for a license to pursue postgraduate study in general surgery at the Episcopal Hospital. Prior to the grant of such a license an interview is required with a representative of the Board of Medical Licensure of the Commonwealth. That interview took place on August 20, 1956. The application

was approved by the Board, in regular session, at a meeting held on October 20, 1956, retroactively for a period commencing July 4, 1956 (the date of the application) to July 3, 1957. Therefore, on September 13, 1956, the date of plaintiff's accident, Dr. Hatemi's application had not yet been approved.

When he was called to the receiving ward Dr. Hatemi examined plaintiff, took a brief history of the manner in which the accident had happened and ordered x-rays. The x-rays disclosed the fracture and the presence of the nail in the fibula. He took the x-ray plates to Dr. Pennell in his private office in the hospital. Dr. Pennell examined the plates and reviewed with Dr. Hatemi the plan of treatment to be followed in repairing the injury to plaintiff's leg. This plan included a general discussion of post-operative care in which antibiotics were mentioned but no specific reference to penicillin was made. A witness called by plaintiff, however, testified that during his investigation on behalf of plaintiff's employer's compensation insurance carrier Dr. Pennell told him that after the operation he had advised penicillin but at the time had no knowledge of plaintiff's allergy, and that as soon as he found out about it he stopped the use of that drug. While Dr. Hatemi was discussing the matter with Dr. Pennell the junior intern, Rex, was making a physical examination and taking a history of the case. It was specifically by virtue of Dr. Hatemi's order that Rex took this history, for otherwise his duties in the receiving ward did not require him to take histories of patients admitted to the hospital for surgery. Part of the history was taken in the receiving ward and part in the corridor outside the operating room.

After Dr. Pennell and Dr. Hatemi had agreed on the proper procedures and Dr. Pennell had approved of Dr. Hatemi's operating, the latter examined the plain-

tiff's heart and pulse while he was in the corridor. Plaintiff was then brought into the operating room. At that point Rex, remembering that although he had been informed that plaintiff was allergic to penicillin he had neglected to note this fact in the written history, thereupon went to the door of the operating room. But since he was improperly attired hospital procedures prevented his entering the room. He called the nurse anesthetist to the door and asked her to make a notation on the history that plaintiff was allergic to penicillin. She said she would. Prior to the operation Dr. Hatemi read the history. The history produced at the trial shows the notation "Allergic to Penicillin". Rex denied that he made it. There is no evidence in the record to show who made it, or when it was made.

Plaintiff testified Dr. Pennell was in the operating room prior to the operation and lifted his leg by his big toe. Dr. Hatemi personally administered the spinal anesthesia. The nail was extracted and later given to plaintiff in accordance with his request. A cast was placed on the leg and the operation was completed. Dr. Hatemi, as the operation was drawing to a close, dictated the post-operative orders in which he prescribed 600,000 units of penicillin every four hours. After that plaintiff was taken to the ward and prior to the administration of penicillin he advised the nurse on duty that he was allergic to it. Nevertheless, between 8:15 p.m. and 9:00 p.m. she administered penicillin in accordance with the directions contained on the chart. She testified that when the plaintiff arrived in the ward after the operation and as late as 11 o'clock that night there was no notation of a penicillin allergy on the chart. Plaintiff was again given 600,000 units of penicillin at midnight by the succeeding nurse, and again at 4:00 a.m. Plaintiff testified that he told all with whom he came into contact that he was allergic

to penicillin, including two other men in the ward, and that on one occasion, when Dr. Hatemi and Dr. Pennell were present, the former said that he was giving plaintiff "oremycin" but Dr. Pennell told Dr. Hatemi to give plaintiff 25,000 units of penicillin. When plaintiff protested to Dr. Pennell that he was allergic to penicillin the latter merely walked away. Plaintiff insisted that he protested so much against the use of penicillin that the nurses considered him a pest, one of them even refusing to look at Dr. Katzman's note advising against the use of penicillin.

On September 14th, the morning after the operation, when the nurse tried to administer penicillin, plaintiff objected whereupon the nurse called Dr. Pennell who came to the ward and cancelled the order for penicillin and directed that achromycin be given instead. Plaintiff was discharged from the hospital on September 18th.

On the morning of September 20th he developed an allergic skin reaction and called his own physician, Dr. Katzman, who had plaintiff readmitted to the hospital as Dr. Pennell's patient. The next morning plaintiff suffered a cerebrovascular accident followed by severe physical and personality changes as a direct result of the penicillin reaction.

The various charts and admission sheets for both the first and second admissions were signed by Dr. Pennell over the printed form at the place where the "Chief or Attending M.D." should sign.

Plaintiff was discharged from the second admission to the hospital on October 4, 1956. Under date of November 6, 1956, Dr. Pennell submitted to the Pennsylvania Manufacturers Association Casualty Insurance Company, which was the carrier of plaintiff's employer's workmen's compensation insurance, a medical voucher for charges for himself in the sum of $80

for daily visits from the date of plaintiff's first admission on September 13 through September 18 and daily visits from his second admission on September 20 through October 4, 1956, and $100 for the operation performed on September 13, 1956. Dr. Hatemi was not himself permitted to make any charge. The insurance company sent its check to Dr. Pennell in the sum of $180 which he deposited to his account.

The medical testimony shows that of all the antibiotics penicillin is the one most likely to cause allergic reactions and this has been known since 1943. Such reactions may occur immediately, that is, within a minute or two or as much as four weeks later, and can have serious consequences involving the brain, nerves, gastro-intestinal tract, skin and the blood.

We must decide then whether the doctrine of *respondeat superior* has been properly applied. It is clear that the relationship of physician and patient existed between Dr. Pennell and plaintiff commencing September 13 and continuing throughout plaintiff's first and second admissions. Dr. Lucius Roy Wilson, Director of Episcopal Hospital, testified unequivocally that in accordance with the practice of the hospital plaintiff was Dr. Pennell's patient. This is supported by the fact that Dr. Pennell signed the chart at the place reserved for the "Chief or Attending M.D." and later submitted to the compensation carrier his bill, which was paid. In treating plaintiff Dr. Pennell therefore owed him the duty of employing such reasonable skill and diligence as is ordinarily exercised in his profession, giving due regard to the advanced state of the profession at the time of treatment. *Powell v. Risser*, 375 Pa. 60, 65, 99 A. 2d 454. It is equally clear that the Episcopal Hospital owed a duty toward plaintiff which it was bound to fulfill irrespective of whether its failure under present law permits recovery against

it. The problem, of course, is whether the persons who administered to plaintiff may be properly said to be agents of Dr. Pennell or agents only of the hospital.

Physicians and surgeons, like other persons, are subject to the law of agency and a physician may be at the same time the agent both of another physician and of a hospital even though the employment is not joint. *McConnell v. Williams,* 361 Pa. 355, 65 A. 2d 243. In determining whether a person is the servant of another it is necessary that he not only be subject to the latter's control or right of control with regard to the work to be done and the manner of performing it, but that this work is to be performed on the business of the master or for his benefit. *McGrath v. Edward G. Budd Manufacturing Co.,* 348 Pa. 619, 623, 36 A. 2d 303, 305. Actual control, of course, is not essential. It is the right to control which is determinative. On the other hand, the right to supervise, even as to the work and the manner of performance, is not sufficient; otherwise a supervisory employee would be liable for the negligent act of another employee though he would not be the superior or master of that employee in the sense the law means it. Restatement, Agency 2d, §220(1) (1958); *Commonwealth to the use of Orris v. Roberts,* 392 Pa. 572, 141 A. 2d 393.

Dr. Hatemi was a paid employee of Episcopal Hospital. In his capacity as a resident he was duty-bound to act on behalf of the hospital. In accordance with that duty he was called upon to see plaintiff upon admission. He made an examination or partial examination of plaintiff. However, under the law, in view of the fact that he was not a licensed surgeon, he could not himself undertake operative surgery without first consulting and receiving approval of the chief or an associate of Surgical Service B. He therefore consulted with Dr. Pennell who authorized him to proceed with

the operation. At this time, in accordance with the rules of the hospital and as demonstrated by Dr. Pennell's later conduct, the plaintiff became the patient of Dr. Pennell. Dr. Pennell had the choice of operating himself or of designating another qualified person to do it for him. He chose Dr. Hatemi to operate in his stead. But when he did so he did not abandon, in contemplation of law, either the right of control or his own interest and duty in the premises. From this moment onward Dr. Hatemi was the agent of Dr. Pennell. His negligence thereafter, if any, is in the light of the verdict imputable to Dr. Pennell. What did Dr. Hatemi do? He directed Rex, the junior intern, to take a history of the case. The evidence is clear that the general duties of Rex qualified him to take case histories. However, in the normal course of events, since the hospital had assigned him to the receiving ward, he would not have taken this history had he not been selected by Dr. Hatemi to do so. In this sense, therefore, Rex was "borrowed" from the hospital. While remaining a general employee of the hospital he became a sub-agent of Dr. Pennell. See *McConnell v. Williams, supra.* He took the history and although informed of the plaintiff's allergy to pencillin, failed to note it on the chart. While defendant's chosen agent, Dr. Hatemi, was performing the operation and therefore in full command of all persons in the operating room to the exclusion of hospital control during that period (see *McConnell v. Williams,* supra), Rex informed the nurse anesthetist of the fact that the history was incomplete. Exactly what followed is not known. If the nurse did as Rex asked and noted the allergy on the chart before Dr. Hatemi read it, or told him of it, a jury could find that Dr. Hatemi himself was negligent. If the nurse failed to correct the history or inform Dr. Hatemi her negligence is apparent. If Dr. Pennell had been in charge of the operation in

place of Dr. Hatemi would he have been responsible for disregarding the correction or for Rex's and the nurse's failure? If so, then he is equally responsible here since his chosen agent, Dr. Hatemi, was acting for him. The knowledge of Rex and the nurse anesthetist and that imputable to Dr. Hatemi was imputable to Dr. Pennell.

We conclude that the harm suffered by plaintiff was caused by the post-operative orders given by Dr. Hatemi during the surgery itself at a time when he was responsible for the acts of both Rex and the nurse anesthetist. It follows from a proper application of the principles of *respondeat superior* that the jury were justified in finding that Dr. Pennell was therefore responsible.

In this case as in *McConnell v. Williams*, supra, "It may well have been in contemplation that [Dr. Pennell] might need help in taking care of [plaintiff], . . . but the necessity of employing assistants is one of the ordinary circumstances of both business and professional life; it is to regulate just such situations that the law of agency exists." What Dr. Pennell chose to do through Dr. Hatemi "was to call for and borrow from the hospital an interne [and a nurse] who thereby became—or so at least a jury might find—his temporary servant or employee for the purpose for which he was engaged." Neither Dr. Pennell nor Dr. Hatemi would be responsible for the acts of agents of the hospital, such as nurses who administered penicillin post-operatively on their own or at the instance of other physicians. Here, the penicillin was administered specifically because of the directions of Dr. Hatemi given while in the operating room and so recorded on the chart. See *Jordan v. Touro Infirmary*, 123 So. 726, 730 (La.) ; *Aderhold v. Bishop*, 94 Okla. 203, 206, 221 P. 752, 754; *Emerson v. Chapman*, 138 Okla. 270, 280 P. 820; *Simons v. Northern Pacific Rwy. Co.*, 94 Mont.

355, 366, 367, 22 P. 2d 609, 613; *Ales v. Ryan*, 8 Cal. 2d 82, 105, 64 P. 2d 409, 420; *Ybarra v. Spangard*, 25 Cal. 2d 486, 492, 154 P. 2d 687, 690.

Defendant was present in contemplation of law since his personally chosen agent performed the operation. When that personally chosen agent performed the operation the hospital employees assisting in it who ordinarily would not be servants either of Dr. Hatemi or Dr. Pennell became, during that operation at least, the agents of Dr. Pennell through the agency of Dr. Hatemi. Indeed, plaintiff testified that for at least a part of the operative procedure in the operating room Dr. Pennell was personally present. During the operation the intern, nurses, etc., were not acting "in the regular course of services furnished by a hospital" as in *Powell v. Risser*, 375 Pa. 60, 99 A. 2d 454. The hospital was not performing the operation. They were present and acting on behalf of the operating physician whether or not they were still acting on behalf of the hospital.

In *Benedict v. Bondi*, 384 Pa. 574, 122 A. 2d 209, a student nurse filled two hot water bottles with water that was too hot, turned them over at the direction of Dr. Bondi to a graduate nurse, who applied them to the feet of a three year old child. We reversed a nonsuit as to Dr. Bondi on the ground that even though a surgeon is not ordinarily responsible for pre-operative preparation or post-operative care, *Shull v. Schwartz*, 364 Pa. 554, 73 A. 2d 402; *Scacchi, Administrator v. Montgomery*, 365 Pa. 377, 75 A. 2d 535, the negligence of the nurse occurred during the operation itself. Here the instructions were given during the operation itself. In *Shull v. Schwartz*, 364 Pa. 554, 73 A. 2d 402, we affirmed a judgment for defendant upon a jury's verdict where, after a successful operation, a hospital intern, in the absence of the operative surgeon, negligently removed stitches as part of the post-operative treatment.

This decision turned on the fact that the surgeon did not personally participate in the act which caused the injury.

In *Scacchi v. Montgomery*, 365 Pa. 377, 75 A. 2d 535, we said: "There was no evidence that the hospital intern or nurse were negligent in their post-operative care of the patient, but even if they had been, the defendant under the facts in this case would not have been liable: Stewart v. Manasses, 244 Pa. 221, 90 A. 574; McConnell v. Williams, 361 Pa. 355, 65 A. 2d 243." In the instant case, however, there is no contention that post-operatively the nurse who administered penicillin did so negligently. She acted in strict accordance with the post-operative care *prescribed* by Dr. Hatemi.

The defendant had the requisite right of control and supervision over the conduct of the persons acting for him. He was required by law to supervise any operation by Dr. Hatemi and Dr. Hatemi was similarly required to submit to his supervision. Defendant actually assumed the supervision of the plaintiff's treatment and, as he himself testified, he consulted with Dr. Hatemi not only with respect to the surgical procedure but the pre and post-operative procedures as well. He testified indeed that their discussion did cover the question of post-operative antibiotics though penicillin was not specifically mentioned. The defendant's area of concern and control was not limited simply to the extraction of the nail and reduction of the fracture. His power and his duties did not end at the door of the operating room. His own testimony proves this. A further indication that this is so is found in the fact that when plaintiff complained to the nurse on the following morning she called Dr. Pennell and he exercised his undoubted power by ordering discontinuance of the pencillin.

As we said in *McConnell v. Williams*, 361 Pa. 355, 360, 65 A. 2d 243, "Where one person lends his servant

to another for a special employment the test is whether, *in the particular service he is engaged to perform,* he continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired: . . .

"When different inferences can fairly be drawn from the evidence as to who is the controlling master of the borrowed employee at the time of the commission of the negligent act, it is for the jury, not the court, to determine the question of agency: . . ."

It is inferrable from the evidence in this record that Mr. Rex and Dr. Hatemi were made available to the defendant by the hospital and that the care and treatment of the plaintiff was defendant's business; and further, that the resident and junior intern were subject to the defendant's control precisely in respect of the actions which caused the plaintiff's injury.

The judgment is affirmed.

---

DISSENTING OPINION BY MR. JUSTICE BENJAMIN R. JONES:

The majority of this Court would uphold the imposition of personal liability in damages upon a surgeon of a charitable hospital's surgical staff for an injury to a person, not the surgeon's private patient, caused by the alleged negligence of an intern and resident surgeon, neither of whom were employed by, compensated by, nor subject to discharge by the surgeon, the alleged negligent acts having been performed neither in the presence of the surgeon nor under his physical control.

The majority opinion acknowledges that "if the judgment of the court below can be supported only on the evidence of direct negligence of defendant then

the judgment cannot stand since this issue was not submitted to the jury", and it upholds liability on the part of the surgeon on the theory of *respondeat superior*. The majority opinion clearly poses the basic question: "whether the persons (the intern and resident surgeon) who administered to plaintiff may be properly said to be agents of Dr. Pennell or agents only of the hospital" and resolves that question by concluding that both the intern and the resident surgeon were agents of Dr. Pennell.

The negligence averred in the complaint was three-fold: (1) Dr. Pennell "negligently ordered penicillin to be administered to the plaintiff"; (2) Dr. Pennell "negligently failed to give orders that penicillin should not be administered to plaintiff"; (3) Dr. Pennell failed "to supervise and control his servants or those of the hospital . . . acting at the time on his behalf . . . so as to prevent penicillin from being used in plaintiff's treatment." Neither (1) nor (2) are supported by any evidence of record: there is not a scintilla of evidence that Dr. Pennell ordered the administration of penicillin or that he knew or should have known of plaintiff's allergy to penicillin. The only justification for the imposition of liability advanced in the majority opinion is that the intern, Mr. Rex, knew or had reason to know of plaintiff's allergy and such knowledge on the part of Mr. Rex was imputable to the resident surgeon, Dr. Hatemi, which knowledge was in turn imputable to Dr. Pennell, on the theory that Dr. Hatemi was his agent and Mr. Rex his sub-agent.

An examination of the relationship of Dr. Hatemi to the hospital and the circumstances disclosed by the record cast serious doubt on the integrity of the majority's conclusion that plaintiff was Dr. Pennell's patient so that he personally had the duty of performing, or of designating someone to perform, the operation

on plaintiff and that, as a result of this duty, Dr. Hatemi became the agent of Dr. Pennell in the performance of the operation. Dr. Lucius Wilson, the Director of Episcopal Hospital, testified that the assignment of the plaintiff to Dr. Pennell did not of itself make him the latter's private patient; that it was part of Dr. Pennell's general duties to see that free patients and ward patients were provided with adequate care; and that Dr. Pennell never assumed any responsibility with respect to this patient other than the ordinary responsibility of an associate surgeon to a ward patient. The evidence further disclosed that the plaintiff was received into the hospital in the name of Dr. Rosemond, the then nominal chief surgeon of the hospital. Following the ordinary and customary hospital procedure, Dr. Hatemi, the resident surgeon, an employee of the hospital on duty at the time, was notified and examined the plaintiff.

Dr. Hatemi, the resident surgeon, was hired by the hospital, and only the hospital had the right to discharge him. A small monetary compensation was paid him by the hospital, and, in addition, *the hospital agreed to further instruct the resident in surgery in return for his services to the hospital, which instructions included the performance of minor surgery such as that involved in the present case.* Under the rules of the hospital, a resident surgeon was not permitted to perform any operation, except in an emergency, without the consent of the chief or one of the associate surgeons. He was not permitted to have private patients, nor to receive any remuneration from the hospital patients whom he treated. Compensation for his services consisted of the small monetary stipend, and the advancement of his education through the performance of his duties, *including minor surgical operations, and the instruction and advice given to him by the as-*

*sociate surgeons.* The associate surgeons received no compensation from the hospital for the instruction and supervision rendered to the resident surgeons. It was the practice of the hospital, however, to permit the associate surgeon who consented to and generally supervised the action of the resident to receive any compensation from an insurance carrier or from the patient for the services rendered by the residents, and this practice was followed in the present case.

Patients admitted to the hospital could not be assigned to the resident, but were assigned to the associate surgeon who counseled the resident. Such assignments were not governed on the basis of the patient's status as a paying or non-paying patient, but rather on a rotation basis, depending on which associate surgeons were on duty and available at the time when the request to operate was made by the resident.[1]

As the majority opinion correctly states, Dr. Hatemi could only have been the agent of Dr. Pennell if he were employed "(1) to perform services in aid of [Dr.

---

[1] Dr. Hatemi, while being examined by plaintiff's counsel as on cross-examination, stated that: "Q. . . . After you saw Mr. Yorston what if anything did you do? A. I checked the patient and took a history how did it happen, ask him, and the brief story of his past. Then I took the x-ray of his leg and I saw the x-ray which was a nail in the one of the bone of the leg, and I took the x-ray to Dr. Pennell's office because at that time no any other doctor was available in this hospital in our Service. Q. You mean you went to Dr. Pennell because he was the only one available? A. Of our Service." The evidence disclosed that at the time in question Dr. Pennell was assigned to the women's and children's side of the service, and in the ordinary course of events would not have been assigned or under a duty to supervise the treatment of the plaintiff. Although the supervision of Dr. Hatemi's treatment of the plaintiff was not one of the *specific* duties of Dr. Pennell when assigned to this side of the service, it was one of his *general* duties under hospital rules to advise any resident surgeon when requested to do so. Compare with note 2 infra.

Pennell's] *private business affairs* and (2) [was] subject to his control:" *Commonwealth to the use of Orris v. Roberts et al.,* 392 Pa. 572, 584, 141 A. 2d 393. Dr. Hatemi, however, was performing the duties for which he had been hired by the hospital, namely, the treatment of patients received by the hospital in the ordinary course of its business. Minor surgical operations were obviously included within these duties. Moreover, part of the compensation Dr. Hatemi received from the hospital was the right to improve his surgical skill by the performance of these operations. The rules of the hospital, however, required that this be done under the supervision of an associate surgeon, and the latter was required by the hospital to furnish such supervision and instruction to a resident surgeon without compensation by the hospital for the performance of such function. It seems obvious that the right of the associate surgeon to charge a compensation carrier for the services of a resident surgeon was intended to serve as partial compensation for the fulfillment by the associate surgeon of the hospital's obligation to instruct and advance the surgical education of the resident. It is clear that if the instant plaintiff was anyone's patient, he was the patient of Dr. Hatemi, and that Dr. Pennell rendered only supervisory control over Dr. Hatemi, as he was required to do by the hospital rules. Under the circumstances, I believe that both the operation performed by Dr. Hatemi, and any supervisory control exercised by Dr. Pennell over Dr. Hatemi, were solely in furtherance of the hospital's business, and that no agency relationship between Dr. Hatemi and Dr. Pennell existed.

Assuming *arguendo,* however, that Dr. Hatemi was the agent of Dr. Pennell, our next inquiry is to determine whether there was sufficient evidence of record to justify a finding of negligence on the part of either

or both doctors.   In pursuing this inquiry it must be borne in mind that the negligence, if any, which caused the injury to plaintiff arose not from the surgery performed, but rather from the failure to take a proper pre-operative history which resulted in the post-operative injection of penicillin into the plaintiff who was allergic to the drug.   It is undisputed that there was evidence that the intern was told of plaintiff's allergy and failed to note such fact on the history of the patient which he took prior to the performance of surgery.   On the other hand, there is no evidence that the resident surgeon either had actual knowledge or reason to know of the existence of such an allergy.   There was evidence that while the operation was being performed, the intern "informed the nurse anesthetist of the fact that the history was incomplete."   The majority opinion frankly admits that "Exactly what followed is not known", and then proceeds to substitute conjecture and speculation for proof of what happened.   The majority opinion says, *if* the nurse noted the fact of the allergy on the record, and *if* it was so noted before Dr. Hatemi read the record, or *if* the nurse told Dr. Hatemi of it, the jury could have found Dr. Hatemi negligent.   On the other hand, *if* the nurse did not correct the history or *if* she did not tell Dr. Hatemi, then the nurse would have been negligent.   Our review of the record, and a fact tacitly admitted by the majority, shows no evidence whatsoever that Dr. Hatemi had either knowledge or reason to know that the plaintiff was allergic to penicillin at the time that he ordered the administration post-operatively of that drug.   The majority's imposition of liability on Dr. Pennell must therefore originate with the failure of Mr. Rex to properly record plaintiff's medical history.

The testimony of Dr. Wilson unequivocally demonstrates that the recording of a medical history prior to

an operation is clearly within the duties of an intern such as Mr. Rex. He specifically acknowledged the fact that "[I]t [was] the practice at that time in the Episcopal Hospital in Workmen's Compensation cases to have the history of a surgical patient taken by an [in]tern;" and that it is customary in all hospitals for interns to take histories and for the operating surgeon to rely on such histories. He further testified that the recordation of the history of a surgical patient is part of the "patient care" prior to the actual commencement of the operation. The evidence also clearly demonstrated that Mr. Rex was hired by and considered as an employee of the hospital; that Dr. Pennell had no power to hire or fire him nor any control over his professional assignments; and that the hospital charged plaintiff's employer's compensation carrier for the care rendered plaintiff by its—the hospital's—employees, including Mr. Rex. In view of this undisputed evidence, it is inconceivable how the recording of the medical history by Mr. Rex, admittedly an employee of the hospital whose duties encompassed the taking of such histories, could be considered as anything but standard pre-operative preparation entirely under the control and dominion of the hospital.[2]

----

[2] The majority opinion, however, states: "The evidence is clear that the general duties of Rex qualified him to take case histories. However, in the normal course of events, since the hospital had assigned him to the receiving ward, he would not have taken this history had he not been selected by Dr. Hatemi to do so. In this sense, therefore, Rex was 'borrowed' from the hospital. While remaining a general employee of the hospital he became a sub-agent of Dr. Pennell." The only testimony to support this conclusion is the testimony of Mr. Rex himself. Dr. Wilson's testimony directly contradicted Rex's statement: "Q. Can you tell, please, who took the admission history? A. Mr. Rex. Q. You say Mr. Rex? A. Yes. Q. Who was he? A. Extern. Q. How did he come to take the admission history? A. He was on duty in the Emergency Room. Q.

The problem presented in the instant case is not a new problem in Pennsylvania. In *McConnell v. Williams*, 361 Pa. 355, 65 A. 2d 243, this Court upheld the imposition of liability upon a surgeon on the theory of *respondeat superior* for the negligent act of an intern committed in the operating room where the surgeon, under the evidence, assigned the intern to the task which he performed negligently, to wit, the insertion of a solution into an infant's eyes. The Court noted that the defendant was himself performing the operation, and *for this purpose,* had complete control over those present and assisting in the operating room; that he had freely chosen the intern who was to assist him in the operation; and that the negligent action was committed pursuant to an express direction given by the defendant to the intern *during the course of and as an integral part of the operation.* The *McConnell* rule was again applied by this Court in *Benedict v.*

---

What were his duties? A. His duties were to take histories, consult with the Residents or members of the visiting staff on treatments. . . ." Even assuming, however, that Mr. Rex is correct in that having been assigned to the Receiving Ward, his specific duties at that time did not include the recording of a pre-operative medical history, the majority's holding that he became the sub-agent of Dr. Pennell because "he would not have taken this history had he not been selected by Dr. Hatemi to do so," is indeed strained. The majority in so holding completely ignore the evidence of record establishing that the taking of a medical history is part of the ordinary and customary pre-operative preparation for which the employees of the hospital are directly responsible; that *any* intern is qualified to take a medical history; that it involves no unique or unusual skill not possessed by any qualified intern; that it is not the type of action which requires the "selection" of a particular individual; and that at that time Dr. Hatemi had the right to tell Rex to take the history. The evidence clearly discloses that as an intern and employee of the hospital, Rex had the duty of taking medical histories whenever he was requested to do so by a doctor, regardless of whether or not his specific duties at that particular moment encompassed such action.

*Bondi*, 384 Pa. 574, 122 A. 2d 209, where the operating surgeon was held liable for injuries resulting from the application of excessive heat to the feet of the child-patient. This Court again noted that the surgeon was physically present in the operating room and expressly directed the application of the heat to the child's feet and "that such an application is not a routine matter in all operative procedure but is sometimes employed where the patient is in shock; that it is therefore a decision for the surgeon to make and for him to determine and direct if, when and how heat should be applied" and "that his legal responsibility did not begin merely at the exact moment when he started to make an incision in the child's body but that the operative process started with, and included, the application to the child—*in the operating room and under the eye of the surgeon*—of the hot water bottles. . ." (Emphasis supplied). In both cases, however, liability was specifically discounted where it involved pre-operative or post-operative treatment, not directly related to the operation itself, and where the person sought to be held liable was not physically present when the negligent act occurred. In the *McConnell* case, the reason for this distinction was aptly set forth by Mr. Justice (later Chief Justice) STERN: "Defendant's counsel cites several cases from other jurisdictions in an attempt to show that an operating surgeon is not generally held liable for the negligence of hospital internes and nurses. In those cases, however, the negligence on the part of the nurse or interne was in connection with the post-operative care of a patient, *not administered in the presence or under the control of the surgeon.* Plaintiffs do not contend that a surgeon's liability should apply, after the operation is concluded, to treatment administered by floor nurses and internes in the regular course of the services ordinarly furnished by a hospital; *as to all such care and attention they would clearly be acting*

*exclusively on behalf of the hospital and not as assistants to the surgeon.* But for the period of the operation itself the situation is entirely different, and if operating surgeons were not to be held liable for the negligent performance of the duties of those *then* working under them, the law would fail in large measure to afford a means of redress *for preventable injuries sustained during the course of such operations."* (Emphasis supplied). In *Benedict v. Bondi,* 384 Pa. 574, 580, supra, this doctrine was again reiterated by this Court when Chief Justice STERN stated: "Dr. Bondi contends that such control does not exist in regard to either pre-operative preparation or post-operative care *which is not administered in the operating room in the presence of the surgeon and under his direct charge, and such indeed is the law*: McConnell v. Williams, supra, p. 364, A. p. 247; Shull v. Schwartz, 364 Pa. 554, 73 A. 2d 402; Scacchi, Administrator v. Montgomery, 365 Pa. 377, 75 A. 2d 535." (Emphasis supplied).

In the present case, the majority was faced with two major problems: (1) the defendant was not present in the operating room at the time the alleged negligent act occurred; and (2) no negligent act was committed by anyone during the course of the operation in so far as it related to the conduct of the operation: on the contrary, the record is that the operation was performed with competency and successful in purpose. The majority surmounts the first obstacle by ignoring the reason assigned in *McConnell* for requiring the presence of the surgeon-defendant in the operating room and by the application of the expanded surgeon-assistant agency relationship previously discussed. The majority attempts to supply the second deficiency in two steps: (1) because Dr. Hatemi had complete control over the persons assisting in the operation, Mr. Rex's knowledge of the allergy, which he communicated to the

nurse anesthetist while in the operating room, is imputed to Dr. Hatemi; (2) because Dr. Hatemi ordered certain post-operative treatment which by the imputation of this knowledge to Dr. Hatemi constituted negligent treatment. Under the majority's view apparently this constitutes the negligence that was committed during the course of the operation.[3]

The majority opinion thus states: "While defendant's chosen agent, Dr. Hatemi, was performing the operation and therefore in full command of all persons in the operating room to the exclusion of hospital control during that period (see McConnell v. Williams, supra), Rex informed the nurse anesthetist of the fact that the history was incomplete." From this assumed control, the majority imputes to Dr. Hatemi that which Rex told the nurse who may or may not have recorded it. Assuming *arguendo* that the majority's holding on agency is correct, undoubtedly defendant, through his agent Dr. Hatemi, had control of all persons in the operating room, *but only for the purpose of the proper and successful conduct of the operation.* See *McConnell v. Williams,* 361 Pa. 355, supra.

---

[3] While Dr. Hatemi was being examined by plaintiff's counsel as on cross-examination, he stated: "Q. Did you order penicillin as part of the post-operative orders, A. Yes . . . Q. Was that before the operation was finished or after that you dictated these orders? A. After it finished. . . . Q. Are the post-operative orders an essential part of the operation and post-operative care? A. That's right. Q. Is it part of the operation itself? A. No. Q. Is it part of the entire procedure? A. This is not operation. This is order, post-operative care." This was not contradicted by any of plaintiff's witnesses. Although it is true that the orders were given while Dr. Hatemi was completing the cast on·plaintiff's leg, his testimony demonstrates that as far as any relevant medical evidence of record in the present case is concerned, it establishes that as a matter of medical opinion post-operative orders are not part of the operation.

When Mr. Rex failed to inform Dr. Hatemi of the inaccurate history he was negligent, but such negligence was related only to the patient's post-operative care. The subsequent attempt during the operation to rectify his initial negligence in failing to properly record plaintiff's medical history, a routine pre-operative function performed by hospital employees, was irrelevant both to the operation and to the rationale of *McConnell* in holding that a surgeon has complete control of the actions of persons in the operating room, *but only for the purpose of conducting the operation and "to afford a means of redress for preventible injuries sustained during the course of such operations."* If Rex had told or failed to tell the anesthetist one-half hour before or one-half hour after the operation, would either or both of them have been any more or less negligent in failing to communicate this fact to Dr. Hatemi during the operation? Would this negligence still be imputable to Dr. Hatemi because he had complete control of them while in the operating room, when the fact that the plaintiff was allergic to penicillin was completely irrelevant to the success or failure of the surgery? If a nurse had informed the anesthetist during the operation that certain rooms were not to be used because the previous occupants had a communicable disease, would this knowledge have been imputable to Dr. Hatemi and would Dr. Hatemi be held liable for complications resulting from his sending a patient to that room because "he was performing the operation and therefore in full command of all persons in the operating room?" If an ambulance driver negligently administers an overdose of morphine to a plaintiff enroute to the hospital, will a communication of this fact to a nurse in the operating room impute this knowledge to a surgeon performing the operation who orders additional morphine as post-operative treatment

because he "was performing the operation and therefore in full command of all persons in the operating room?" In previous cases, the doctrine of absolute control by a surgeon over those assisting him during an operation was applied solely for the purpose of placing responsibility on the person who was primarily and directly entrusted with the success or failure of the surgery. Under the majority view, however, this doctrine is now to be used for converting the operating room into a combat information center where information as to and liability for the previous negligent actions of hospital employees—unrelated to the success or failure of the operation—may be transmitted and transferred to the operating surgeon, and for insuring employees of a convenient receptacle where their negligent actions may be discarded whether or not they have any relation to the successful performance of the operation.

Nor does the majority's second step, namely, that Dr. Hatemi was negligent because he gave instructions to administer penicillin as part of the post-operative treatment during the course of the operation have any more validity. In *Shull v. Schwartz*, 364 Pa. 554, 73 A. 2d 402, this Court affirmed a judgment for the defendant where a hospital intern after a successful operation and upon the direction of, but in the absence of the operative physician, negligently failed to remove two stitches as part of the post-operative treatment. See also: *Powell v. Risser*, 375 Pa. 60, 99 A. 2d 454; *Scacchi v. Montgomery*, 365 Pa. 377, 75 A. 2d 535. The majority distinguishes these cases on the ground that the nurse who administered the penicillin did not do so negligently, but "acted in strict accordance with the post-operative care *prescribed* by Dr. Hatemi." No one contends that the nurse negligently administered the penicillin, nor can anyone contend that Dr. Hatemi

negligently *prescribed* penicillin, nor that such a drug constitutes improper post-operative treatment, *unless* one imputes knowledge to Dr. Hatemi that the plaintiff was allergic to penicillin by the application of the "all inclusive control doctrine" previously discussed. The negligence in the present case consisted of the failure of Mr. Rex to properly record the plaintiff's medical history, a pre-operative function, while in the *Shull* case, the negligence consisted of a failure to properly remove the stitches, a post-operative function. Neither *McConnell, Shull* nor any of the other Pennsylvania cases cited by the majority distinguish between pre-operative or post-operative negligence of an intern or nurse. In neither situation has a physician-surgeon been held liable. If the pre-operative and post-operative exclusion from surgeon liability set forth in *McConnell* and recently reiterated in *Benedict* is to have any meaning, it must be applied to such a factual situation as herein presented where such negligence as exists can only be traced to the failure of a person or persons employed by the hospital and under its control to properly perform routine pre-operative functions.

An examination of the majority's views and the instant record leads inescapably to an obvious conclusion. Faced with the absence of *any* evidence of negligence in the performance of the surgery or of *any* control, direct or indirect, by the surgeon-defendant (or his agent) *in the operating room* over the actions of the person whose negligence resulted in plaintiff's injury, the majority of this Court, in an *attempt* to bring the instant case within the rules of *McConnell* and related cases, has had to rely on two bases, both weak and legally insupportable, namely, the imputation of knowledge completely unrelated to the conduct of the operation and the prescription of the administration of penicillin during post-operative care, the latter made

improper only if the imputation of knowledge of plaintiff's allergy be fallaciously applied. The result of the majority's opinion finds justification neither in law nor in reason. I accordingly dissent.

Mr. Justice BELL joins in this dissenting opinion.