**Gerald J. SCHULER, Administrator of the Estate of Betty Mae Carlier, Deceased, Plaintiff,**

v.

**Melvin M. BERGER, M. D., Defendant.**

**No. 31457.**

United States District Court
E. D. Pennsylvania.

Sept. 28, 1967.

James E. Beasley, Philadelphia, Pa., for plaintiff.

Francis E. Shields, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant.

SHERIDAN, District Judge.*

Plaintiff, Gerald J. Schuler, administrator of the estate of Betty Mae Carlier, deceased, brought a malpractice action against defendant, Melvin M. Berger, an obstetrician-gynecologist, under the Pennsylvania Wrongful Death Act, 12 P. S. § 1601 et seq. and Survival Act, 20 P.S. § 320.601 et seq. The jury returned a verdict for plaintiff and awarded damages under both acts. Defendant's motions for judgment notwithstanding the verdict (n. o. v.) and, in the alternative, for a new trial, are before the court.

This is a diversity action. The court has jurisdiction under 28 U.S.C.A. § 1332. The substantive law of Pennsylvania applies.

* Chief Judge of the Middle District of Pennsylvania, Sitting by Special Designation.

On February 27, 1961, Betty Mae Carlier, age 24 years and wife of George Carlier, came to defendant for obstetric care during her first pregnancy. She remained under his sole and exclusive care throughout her pregnancy, subsequent delivery on August 13, 1961, and postpartum period until her death on August 16, 1961. In the afternoon of August 13, Mrs. Carlier began to have labor pains, and at about 5:00 P.M. defendant ordered her to the hospital. She came under the care of Dr. Sugden, an intern, and Dr. Chung, a resident. She received medication for pain on orders written by Dr. Chung and countersigned by defendant. Defendant did not see her until shortly before 8:27 P.M. when he delivered Mrs. Carlier of a premature male infant, Daniel George Carlier. The episiotomy was repaired by Dr. Chung.

On August 14, Mrs. Carlier complained of cramping abdominal pains. On August 15, she complained of progressively severe pain in the left lower abdominal quadrant, aggravated by movement, with associated left shoulder and back pain. At 2:30 P.M. Dr. Sugden found voluntary guarding in all abdominal quadrants and reported his findings to Dr. Alexandrian, a resident who had relieved him. Dr. Alexandrian noted that Mrs. Carlier screamed occasionally, but after examination concluded she had a postpartum psychosis. He prescribed an intramuscular dose of Compazine, a tranquilizer. At about 5:00 P.M., in a telephone conversation, Dr. Alexandrian fully apprised defendant of Mrs. Carlier's condition. No diagnostic or evaluatory procedures were ordered, however. At 8:00 P.M., the severity of Mrs. Carlier's pain, which rendered her to be unable to walk, caused her husband to call defendant. Defendant attributed the symptoms to normal postpartum cramps as magnified by a low pain threshold. During the day of August 15, Mrs. Carlier received Librium, a tranquilizer, on four occasions; Compazine at 4:30 P.M.; Miltown, another tranquilizer, at 9:15 P.M.; two capsules of Darron Compound, an analgesic drug, at 2:00 A.M.; and two A.P.C. tablets, with a full grain of codeine, at 7:00 P.M. All orders were countersigned by defendant. Mrs. Carlier was reportedly asleep when the defendant called the maternity floor between 11:00 and 11:30 P.M. The hospital record showed that at 11:30 P.M. Mrs. Carlier was discovered in profound shock, with no pulse or blood pressure obtainable, cold and clammy, with abdomen distended. Dr. Lentz, an intern, and Dr. Chung were summoned. For the period from 11:30 P.M. to 1:00 A.M., no active or therapeutic measures are reported on the chart. Defendant, notified by telephone at 1:00 A.M. on August 16, ordered an intravenous infusion of glucose and water with Aramine, a vasopressor drug. Whether this was successfully started is disputed. Dr. Chung stated that all attempts to start the infusion were unsuccessful. Defendant, who arrived at about 1:15 A.M., testified that the intravenous was started but the needle came out of the vein; whether it was restarted is also disputed. No cutdown was performed. Following a physical examination by defendant, which was completed by 1:30 A.M., the diagnostic and therapeutic measures consisted merely of aspiration of vomitus, administration of oxygen, application of heat and elevation of the feet, other than the attempts to give intravenous fluids.

Mrs. Carlier was pronounced dead at 3:30 A.M. on August 16, 1961. Defendant stated on the death certificate that the onset of Mrs. Carlier's condition had occurred four to six hours prior to her death.

The autopsy findings were a diverticulitis of the sigmoid colon with an acute rupture of the diverticulum resulting in peritonitis. The medical witnesses all agreed that the symptoms of diverticulitis were obscure and that no doctor could have diagnosed it. The jury was instructed that they could not find negligence based on a failure to diagnose. Plaintiff claims defendant was negligent in failing to take the necessary and proper steps to detect and treat the peritonitis, which would have saved Mrs. Carlier's life.

■ MOTION FOR JUDGMENT N. O.V.: Defendant argues that plaintiff failed to prove proximate cause because

his expert witness never testified that "the result in question [Mrs. Carlier's death] came from the cause alleged [Dr. Berger's conduct]."

Dr. Spelman, plaintiff's expert, testified on direct examination:

"Q Doctor, do you have an opinion as to whether or not the failure to render reasonable medical care during this period of time was a substantial factor in the production of her death?

"A I feel that there is good reason to believe that if this shock had been promptly treated and that she had come out of shock and had been successfully operated upon, that the colon could be repaired, that peritonitis drained, the infection treated with antibiotics, and she would have been alive today."

On cross-examination, Dr. Spelman testified:

"Q Doctor, if the antibiotics, as you suggest should have been given had been given, and there had been a laparotomy, can you say with any certainty that Betty Mae Carlier would have survived that night?

"MR. BEASLEY: I object. He has already answered this question about four times.

"THE COURT: Overruled.

"A No. I feel that she would have, but I cannot state that with any degree of certainty."

The argument is that "there is good reason to believe" and "I feel she would have" is tantamount to stating that death "might have" resulted, or "possibly" or "probably" did result from defendant's conduct and that such expressions are insufficient under Pennsylvania law. Dr. Spelman's responses were equivalent to saying that he believed that had certain specified therapeutic measures been taken, Mrs. Carlier would have survived. It is true that expert testimony must assert that it is the professional opinion of the witness that the result came from the cause alleged. Smail v. Flock, 1962, 407 Pa. 148, 180 A.2d 50. The use of "I believe" amounts to an assertion of an expert's professional opinion. Jones v.

Philadelphia & Reading Coal & Iron Co., 1926, 285 Pa. 317, 132 A. 122. In Auerbach v. Philadelphia Transp. Co., 1966, 421 Pa. 594, at 604, 221 A.2d 163, at 171, a medical expert testified "Well, had she not had an amputation on one side, I feel quite certain she would not have fallen." This was held to be sufficient. While on cross-examination Dr. Spelman indicated that he could not state with certainty that Mrs. Carlier would have lived, he did state that in his opinion she would have lived. This was sufficient. McMinis v. Philadelphia Rapid Transit Co., 1927, 288 Pa. 377, 135 A. 722.

Defendant also argues that Dr. Spelman listed six conditions as a prerequisite to his conclusion, which, apparently, make it conjectural. These were not, strictly speaking, "conditions" prerequisite to the conclusion; rather, they were an enumeration of the various steps which would have had to be taken, and which the testimony showed were not taken, to save Mrs. Carlier's life. The evidence of the absence of these steps was accepted by Dr. Spelman and formed part of the basis for his ultimate conclusion.

In Hicks v. United States, 4 Cir. 1966, 368 F.2d 626, at page 632, the court stated:

"When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a *certainty* that the patient would have lived had she been hospitalized and operated on promptly.

\* \* \* \* . \* \*

\* \* \* Proximate cause is tested by the same standard, i. e., *causation*

*is proved if the master's omission destroys the reasonable possibility of rescue \* \* \*."*

In note 3, the court pointed out:

"Other circuits have similarly held that if the victim might have been saved by a precaution which the defendant negligently omitted, the omission is deemed to have caused the harm, even though it is not possible to demonstrate conclusively that the precaution would in fact have saved the victim. \* \* \*"

Aside from the opinion of Dr. Spelman, the jury had before it enough medical evidence on which to find causation. Defendant testified it is accepted medical practice to do blood work when a patient is in shock and that a failure to do it would be negligence. A nurse's note on the chart showed "blood work done, type and cross match," but the pathologist testified that all requests for blood work are under his supervision and that the laboratory records showed neither a request slip nor that any blood work had been done on the 15th or the 16th of August. The records showed Mrs. Carlier had only a prenatal typing of blood, and that her blood had not been cross matched. Defendant's explanation that the blood work had probably been ordered by Dr. Chung and that in emergencies it is common to give oral orders for blood work was for the jury. The jury could have found that blood work was not performed, that it should have been, and that the failure to perform it was negligence.

■ MOTION FOR NEW TRIAL: Defendant argues that the court improperly instructed the jury that it could find defendant vicariously liable for the negligence of all hospital employees (residents, interns and nurses) who treated Mrs. Carlier. He relies on the following part of the charge.

"Dr. Berger admitted, as I recall, that he had had the right to supervise and control the actions of all those who administered to Mrs. Carlier."

While he admits that the court properly charged the jury on the standards of vicarious liability, he argues that the admission related to events which took place only in the late evening of August 15 and early hours of August 16, and had no reference to any acts or omissions of others which had taken place earlier in the day when he was not present. The above part of the charge is taken out of context. After instructing the jury on the standards applicable to vicarious liability, the court reviewed some of the relevant evidence. The court then instructed the jury on the manner in which the evidence should be considered:

"Dr. Berger admitted, as I recall, that he had had the right to supervise and control the actions of all those who administered to Mrs. Carlier. His testimony was something like this, 'I was the captain of the ship. She was my patient. She was my responsibility.'

"In your deliberations you should consider this and any other evidence which bears on the question of whether the residents and interns were the agents of Dr. Berger. Remember I said earlier that it is the right to control which is determinative.

"If you find that Dr. Berger had the right to control with regard to the care rendered and the manner of performing it, and that such care was performed on the business of Dr. Berger or for his benefit, then Dr. Berger would be liable for any negligent acts or omissions of the others who attended Mrs. Carlier.

"I would say this to you, that as a matter of law from the time that Dr. Berger arrived at the hospital, whatever time that was, at 1:15 or 1:30 or whatever it was, from that point on those in attendance, Dr. Chung, Dr. Lentz, the nurse, and so forth, were his agents. He said he was the captain of the ship and it was his responsibility.

"As to things that happened prior to that time, I am leaving it to you to find as a fact, with the instruction that you

must determine did Dr. Berger have the right to control. It is the right to control that is determinative. And you should consider all of the evidence in the case in this respect.

"You understand, of course, that Dr. Berger who personally administered to Mrs. Carlier and who directed actions by other doctors in attendance, would be liable for his own negligent acts or omissions regardless of the presence or absence of any agency relationship."

Defendant had requested a charge that defendant would not be liable for the acts of hospital employees who perform their usual functions "and are not directly supervised by the Defendant physician." This was denied because vicarious liability was covered in the charge, and also because the right to control, and not direct supervision, is the proper standard. Yorston v. Pennell, 1959, 397 Pa. 28, 39, 153 A.2d 255, 85 A.L.R.2d 872.

The evidence was sufficient to submit to the jury the agency of all residents and interns who attended Mrs. Carlier:

"Q Now, as you said, you were the captain of the ship. Now, the patient who was being treated was your patient, is that correct?

"A [Defendant] Yes.

"Q And the interns and the residents and the nurses who were treating Mrs. Carlier were treating her under your control?

"A Yes.

"Q You could direct them not to treat her or not to do something or rewrite an order or tell them whatever you wanted to as far as your private patient was concerned.

"A Correct."

\*    \*    \*    \*    \*    \*

"A [Dr. Alexandrian] Anything we order it's on the consent of the private physician. We don't order anything without their consent.

"Q Are you saying that you don't give an order in an emergency?

"A If it is absolutely an emergency we call him and he will come over.

"Q And until that time the patient waits until the physician gets there?

"A We have authority to write anything we want but that is their consent [sic]."

\*    \*    \*    \*    \*    \*

"Q When you work as a staff physician you work under the control of the patient's physician; is that correct? You do whatever the patient's physician tells you?

"A [Dr. Chung] Right. Most of the times, yes."

Moreover, prior to his arrival at the hospital at 1:00 A.M., defendant had ample opportunity to exercise control. He had been apprised of Mrs. Carlier's complaints at 5:00 P.M. by Dr. Alexandrian, and by the 8:00 P.M. call from her husband. Dr. Chung had discussed with him the steps taken by Dr. Chung and Dr. Lentz before his arrival, and these had his approval. Nevertheless, defendant delegated the responsibility to treat Mrs. Carlier.

■ There was sufficient evidence of defendant's direct negligence to support the verdict. The jury could have found that defendant's inaction from 5:00 P.M. until 1:00 A.M. or his failure to take proper procedures after 1:00 A.M. constituted negligence in view of the information at his disposal. Dr. Spelman enumerated the studies and therapeutic measures which were indicated and required to meet the accepted standards of due medical care after Mrs. Carlier lapsed into shock. These were blood studies; cross matching of whole blood for transfusion; x-ray studies of the abdomen; vigorous intravenous fluid infusion; using plasma and whole blood; venous cutdown to administer the fluids if vein puncture was at all delayed; administration of antibiotics by vein; and a laparotomy, after the diagnosis of peritonitis. Although defendant made the diagnosis of shock and peritonitis at 1:30 A.M., none of these measures was taken, except for the attempt at intravenous infusion. The jury might have found that no venous cutdown was performed.

Admittedly, antibiotics were not given, and a surgical exploration was not considered or performed, in spite of defendant's capacity to perform this surgery. In Hicks v. United States, supra, in note 1, the court said:

"Numerous cases have held that a physician has a duty to make proper use of all available diagnostic aids to establish a firm basis for the diagnosis and choice of treatment. * * *"

Defendant explained the course of action he took and why he had not taken certain other actions. These explanations were for the jury.

■ Defendant questions the competency of Dr. Spelman to testify to the standard of care of an obstetrician-gynecologist in treating shock. Dr. Spelman, a graduate of Yale Medical School, is the Medical Examiner for the City of Philadelphia. His studies have included obstetrics-gynecology and internal medicine and surgery. He is a professor of pathology at the Medical Schools of the University of Pennsylvania, Temple University and at Jefferson Medical College. His work requires him to constantly review hospital charts and records, to work closely with physicians and to be knowledgeable of current medical standards of treatment and care, to determine the causes of death, and to determine whether treatment and care comport with medical standards. He is consulted on a daily basis by other doctors. The County Medical Society in Philadelphia, at his request, established a mortality survey committee to which he refers cases considered by him to be below accepted standards. He was certainly qualified to testify. The weight of his testimony was for the jury. Roberts v. United States, 3 Cir. 1963, 316 F.2d 489.

■ Defendant argues next that the court erred in permitting Milton Rosner, proprietor of an employment agency, to testify to the economic value of services rendered by a wife and mother, because this was not a proper subject for expert testimony. A similar argument was made in Merrill v. United Air Lines, Inc., S.D.N.Y.1959, 177 F.Supp. 704. In rejecting the argument, the court stated:

"Popular knowledge and common sense may be and indeed are valuable. But they are not the sole recourse. The fact that parents from time immemorial have taken care of their children does not establish that the views of a professional home economist may not be sounder than those of untrained laymen in determining the cost of those elements that go into the home in order to provide the children with so-called 'substitute mother' care.

"As knowledge becomes more professionalized, specialists will more frequently be called upon as expert witnesses. This is a judicial by-product of an age of pervasive technology and expanding social sciences.

"Expert opinion testimony is, of course, not conclusive or binding upon the jury, as will be charged. Such opinion testimony is only advisory. It is to be treated in the same manner as other evidence in the case. The jury may accept or reject all or part of such testimony." The testimony of Rosner was properly admitted.

See Curnow v. West View Park Co., W.D. Pa.1963, 220 F.Supp. 367, 373.

■ Defendant's remaining contentions concern damages. The court denied him permission to introduce evidence of Mrs. Carlier's premarital pregnancy and four months' marriage. Defendant offered to prove that apprehension of approaching childbirth is more marked in women who become pregnant before marriage and that this and the premature birth were taken into consideration by the doctors in arriving at a diagnosis of postpartum psychosis. This evidence was excluded because, even if it were logically relevant, it was not indispensable for its legitimate purpose, and the undue prejudice which would be caused by its admission made it legally irrelevant. McCormick, Evidence § 152 at pages 319–320; 1 Wigmore, Evidence § 29a (3d ed.); 6 id. § 1864. Subsequently, after Dr. Spelman testified, de-

fendant did not press this ground for admission, but insisted the evidence of four months' marriage was admissible on damages because Mr. Carlier in testifying to his wife's devotion to the satisfaction of his needs made her a marvelous homemaker doing the cooking, baking, laundry, gardening, etc., which might have given the jury the impression they had been married a long time. Even if the fact of four months' marriage was logically relevant, and this is far from clear, it would still have been legally irrelevant. The court suggested that the parties stipulate that Mr. and Mrs. Carlier were married less than a year; plaintiff agreed but defendant refused. If defendant had so stipulated, the jury could not have been misled, and, furthermore, the difference between four months and one year is not that great so as to require evidence of a four months' marriage, which of necessity would reveal the highly prejudicial fact of premarital pregnancy. In addition, defendant did bring out in the cross-examination of Mr. Carlier that the parties lived at only two addresses, a description of the number and size of the rooms in each place, the details of the household services done by Mrs. Carlier, that for several months all these services were done by her at the same time she had full employment, and that on occasions some of the services were done by Mr. Carlier.

Defendant also contends the court erred in excluding evidence of Mr. Carlier's remarriage in connection with damages under the Wrongful Death Act. In Pennsylvania the rights of the surviving spouse are fixed at the moment of death and remarriage cannot be considered in the assessment of damages. Philpott v. Pennsylvania R. R. Co., 1896, 175 Pa. 570, 34 A. 856; Johns v. Baltimore & O. R. R. Co., W.D.Pa.1956, 143 F.Supp. 15, 29, aff'd 3 Cir. 1957, 239 F. 2d 385. In the Johns case, the district court quoting from City of Rome, S.D. N.Y.1930, 48 F.2d 333, and an agency report under review in that case, set forth the reasons why the fact of remarriage is not proper evidence.

" '* * * It may often happen that, by reason of inheritance, or insurance, or by reason of her own industry and superior capacity, a widow may be much better off pecuniarily after her husband's death than she had ever been in his lifetime. No one has ever suggested that such considerations must be taken into account in computing her pecuniary loss. Her remarriage is analogous. The fundamental question is, not her financial situation after her husband's death, but what she might reasonably have expected to receive from him had he lived. * * *

" '* * * If we should enter upon an inquiry as to the relative merits of the new husband as a provider, coupled with his age, employment, condition of health, and other incidental elements concerning him, unavoidably we should embark upon a realm of speculation and be led into a sea of impossible calculations. Moreover, adherence to the rule followed by the commissioner seems essential to consistency with the holding that, upon the death of the first husband, there was "an immediate, final and absolute vesting" in his widow, if the statutory beneficiary, of a cause of action on that account.' "

Cf. Curnow v. West View Park Co., supra, rev'd on other grounds, 3 Cir. 1964, 337 F.2d 241.

Finally, the defendant argues that the court erred in refusing to permit cross-examination of Mr. Carlier on his actual expenses in replacing his wife's services in view of the testimony of Rosner who separately valued the cost to replace the loss of the various services provided by a wife-mother. To have permitted this would have resulted in a disclosure of Mr. Carlier's remarriage and would have opened the door to the "realm of speculation * * * and sea of impossible calculations." The testimony of Rosner was merely a guide to the jury. On cross-examination, defendant effectively brought out whatever improbabilities there were by showing under Rosner's testimony that the substitute would

have to work 22 hours a day to replace a wife's services, with only two hours remaining for sleep, personal attendance, etc. The verdict of $60,000 under the Wrongful Death Act and $1,200 under the Survival Act was moderate and suggests that the jury attached little, if any, weight to the testimony.

The motions for judgment n. o. v. and for a new trial will be denied.